### SWALLUM v. UNITED STATES.
### No. 8471.

Circuit Court of Appeals, Eighth Circuit.

Feb. 26, 1930.

C. N. Jepson, of Sioux City, Iowa (Robert Healy, of Fort Dodge, Iowa, on the brief), for plaintiff in error.

B. E. Rhinehart, U. S. Atty., of Anamosa, Iowa.

Before VAN VALKENBURGH and BOOTH, Circuit Judges, and DEWEY, District Judge.

DEWEY, District Judge.

Plaintiff in error, J. A. Swallum, referred to herein as the defendant, alleged to be a physician duly registered under the act of Congress known as the Harrison Anti-Narcotic Law (26 USCA § 211, 691–707), is charged with having unlawfully sold morphine sulphate by prescription on four different occasions to Richie Feinberg; each occasion being covered by a separate count of the indictment. He was tried and convicted. He complains here of having been entrapped by government agents, and assigns as error the refusal of the trial court to sustain his motion at the close of the evidence for a directed verdict in his favor on that ground.

The evidence of Richie Feinberg, corroborated in many essential parts by H. T. Gillispie, a pharmacist at Ft. Dodge, Iowa, by W. I. Heiberg, a narcotic inspector for the government, and by R. J. Preuss, a federal narcotic agent, was as follows:

"I have been working as an investigator for the government in the narcotic department about seven years. In December, 1926, and January, 1927, I was working in that capacity in and around Storm Lake and at Ft. Dodge, Iowa. I met the defendant the first time on the 22d day of December, 1926, when I went down to his office to secure some morphine. I told the doctor my name was Howard and that I would be around that part of the country during the holidays. I told the doctor I was working around there and wanted to see if I could get some morphine.

"The doctor said he had no straight morphine, but that he had some tablets with other ingredients in. I told him I could not use them. There was a general conversation and I had the doctor write me a prescription. He asked me what amount I was using and I told him about 25 grains a day at that time, and that I wanted 50 grains. So the prescription was written and handed to me for 50 grains.

"I know that the tablets that he offered me when I first talked to him contained morphine. The prescription is offered in evidence. I paid the doctor $4 after I obtained the prescription, and I told him I would be back later. I turned the prescription over to Narcotic Agent Preuss, and went back to Ft. Dodge. The prescription was not filled.

"On January 6, Mr. Preuss and myself went back to Storm Lake. I went to the doctor's office again. I told him I wanted another prescription but the druggist wanted it mailed, that he had no powder and he would rather have it mailed in. So the doctor wrote the prescription for 200 tablets

and wrote that letter and put it in an envelope and I mailed it myself to the druggist at Ft. Dodge.

"At that time the doctor said that 'we better not use the same name as Howard so I will give you another name. It won't look so bad on this prescription with the same name.' The doctor said 'we better not use the same name as Howard. We didn't want all these prescriptions with the same name—found in the same name.' So he stepped over to the telephone directory and took the name out of the directory and put it on the prescription. I believe the name was Loman, or Looman.

"Exhibit B is the prescription that he gave me at that time. He also gave me a similar prescription for 5 grains, 25 tablets, and I believe it was dated an earlier date, dated the 5th.

"I mailed the prescription myself, and there was a note therein telling the druggist that this party would call for same. Exhibit C is the note. I also received at that time Exhibit D. When I got Exhibits C and D, I told the doctor I probably would not remember that name, so he made that little notation with the name on. After putting the prescription and note to the druggist in the envelope, I mailed it at the post office at Storm Lake.

"Exhibit E is the other prescription that I have referred to. I turned Exhibit E over to Mr. Preuss at Storm Lake. Exhibit E was turned over to Mr. Preuss on January 6, when I returned to Storm Lake. The doctor said he didn't want to use the name R. Howard on the prescription and went to the telephone book and picked out another name. After mailing the prescription Mr. Heiberg gave me $10 to go up to the drug store and call for the package which was there. The druggist charged me $6 for it, and I delivered it to Mr. Heiberg.

"On the 17th of January, I called on the defendant again in his office. At the time I called upon him on December 23, I did not call upon him for treatment as a physician. He did not make any examination of me. I told him I was using morphine. I was a drug addict. I told him I was a drug addict.

"On January 6, he made no examination of me, nor was he treating me for any purpose, and I was not his patient at that time. I saw the doctor write these prescriptions and the note that I enclosed in the envelope, and saw him address the envelope which I put in the post office, and which I stamped."

On cross-examination he said: "I have been a dope addict for ten years, but I am not under the influence this morning. The last I used was last night at eight o'clock.

"Q. You went up to Dr. Swallum's hospital on January 6, 1927, to have Dr. Swallum violate the law, didn't you? I didn't have him do anything only what he wanted to do.

"Q. What object or purpose did you have in going up there? A. Go up there and get some morphine.

"Q. And have the Doctor thereby violate the law, you thought, did you? A. Why, that was up to him.

"Q. You went to Dr. Swallum's hospital on January 6, 1927, knowing that you had no right to obtain morphine from Dr. Swallum on that date? A. Yes sir.

"Q. A legal right, didn't you? A. In the line of work I was following, yes sir, working under the narcotic agents to secure morphine and evidence. That was the object and purpose I had in going to Dr. Swallum's hospital on January 6, 1927. I did not use or consume any morphine that I obtained under any prescription that Dr. Swallum gave me. I had no purpose or intention to use or consume any morphine that I might obtain under any prescription that I might have obtained from Dr. Swallum."

The witness R. J. Preuss, in addition to the corroboration referred to, further testified: "I met the defendant in June, 1926. I had a conversation with him and examined his records. I asked the Doctor what became of the morphine that he purchased on his order forms, and Dr. Swallum informed me that drug addicts had got the most of it."

The defendant did not testify or offer any evidence. The government's evidence, therefore, stood undisputed and undenied.

The rules of law regarding entrapment are clearly and concisely set out by Judge Walter H. Sanborn in the leading case of Butts v. United States (C. C. A.) 273 F. 35, 37, as follows:

"It is not denied that, in cases where the criminal intent originates in the mind of the defendant, the fact that the officers of the government used decoys or truthful statements to furnish opportunity for or to aid the accused in the commission of a crime, in order successfully to prosecute him therefor, constitutes no defense to such a prosecution. * * *

"But when the accused has never committed such an offense as that charged against

him prior to the time when he is charged with the offense prosecuted, * * * or any such offense, and had not the means to do so, the fact that the officers of the government incited and by persuasion and representation lured him to commit the offense charged, in order to entrap, arrest, and prosecute him therefor, is and ought to be fatal to the prosecution, and to entitle the accused to a verdict of not guilty."

Instead of there being any evidence to directly, or by inference, sustain the elements of entrapment as set forth in the latter rule, it discloses to the contrary that the doctor had been selling to addicts; that, when opportunity offered, he was ready, willing, and able to commit the offense charged, and that he was not incited or persuaded to commit the offense, but aided and abetted the agent in surreptitiously obtaining the drug.

Defendant relies upon a statement set out in the case of Spring Drug Co. v. United States (C. C. A.) 12 F.(2d) 852, 856, as follows:

"It is well settled by the decisions of the Supreme Court of the United States, we think now universally followed in the several circuits, that, where the government, through its agents, has reasonable cause to believe that the law is being violated by the defendant, they may legally entrap the defendant by decoy letters or by pretended purchases. Price v. United States, 165 U. S. 311, 17 S. Ct. 366, 41 L. Ed. 727; Grimm v. United States, 156 U. S. 604, 15 S. Ct. 470, 39 L. Ed. 550; Goode v. United States, 159 U. S. 663, 16 S. Ct. 136, 40 L. Ed. 297; Andrews v. United States, 162 U. S. 420, 16 S. Ct. 798, 40 L. Ed. 1023; Fiunkin v. United States (C. C. A.) 265 F. 1."

It is the claim of the defendant that the agent who procured the prescriptions for morphine from him did not have reasonable cause to believe that the law was being violated by him, and that he (the defendant) had not violated the law prior to that time. From this is advanced the argument that under this situation a finding of entrapment is conclusively shown by the evidence, and that the defendant was entitled to a directed verdict in his favor.

We do not find any authority holding that lack of probable cause to believe defendant was unlawfully selling morphine, or lack of suspicion in the mind of an agent who makes a pretended purchase, alone, constitutes entrapment. See United States v.

Siegel (D. C.) 16 F.(2d) 134, where the above authorities are digested.

That an agent manufactures an offense against the law and then incites a person against his will to commit that offense for the purpose of prosecution is the gist of a defense of entrapment.

When any evidence of this situation appears, the question whether such a person was approached as an innocent man, or one suspicioned of violating the law, becomes important. United States v. Siegel, supra. There is no evidence here, however, that the agent either manufactured the crime or induced its commission. The lack of evidence then that the agent did not have a belief or suspicion of a prior violation of the law becomes immaterial.

The testimony of the witness Preuss, however, supplies satisfactory evidence that the government agents had reasonable cause to believe that the doctor was, prior to December, 1926, violating the law in selling morphine to drug addicts. His evidence also, as well as the evidence of Richie Feinberg, being undisputed and undenied, strongly indicates that defendant was an old offender.

The situation as disclosed by the evidence does not show entrapment, or evidence that would warrant the court in submitting the question to the jury had it been requested. The case is not unlike Fiunkin v. United States (C. C. A.) 265 F. 1.

The judgment is affirmed.