**MOREI et al. v. UNITED STATES.**

Nos. 8938, 8939, 8941.

Circuit Court of Appeals, Sixth Circuit.

May 14, 1942.

828

Marc J. Wolpaw, of Cleveland, Ohio, (Ralph R. Levenson, of Cleveland, Ohio, on the brief), for appellants Morei and Evans.

Fred S. Day, of Cleveland, Ohio, for appellant Platt.

Roy C. Scott, of Cleveland, Ohio (Francis B. Kavanagh, of Cleveland, Ohio, on the brief), for appellee.

Before ALLEN, HAMILTON, and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

Louis P. Morei, Joseph Evans, and Dr. Matthew G. Platt were jointly indicted with Tony Russo on charges of violation of Sec. 2553, 26 U.S.C.A. Int.Rev.Code, providing that it shall be unlawful for any person to purchase, sell, dispose of, or distribute certain drugs, including heroin. The first count of the indictment charged illegal purchase; the second, illegal sale to Paul Beach, an informer; the third, unlawful conspiracy to sell and to purchase the drug. On trial, defendants were convicted. Defendants Morei, Evans, and Platt appealed, claiming error in the court's charge to the jury; that their convictions were unsupported by evidence; that Morei was entrapped into committing the crime; and that evidence against Dr. Platt was improperly admitted as against Morei and Evans, resulting in prejudicial error to them. Our determination of the appeals is mainly concerned with the denial of motions, made by defendants at the close of the proofs, that the trial court direct verdicts of not guilty.

The Government claims that an informer, named Beach, was sent to buy narcotics from Dr. Platt; that the doctor gave the informer the name of defendant Morei in Cleveland as the man who could get what he wanted; that Morei, aided by his chauffeur, Evans, procured the drug; and that the three defendants were guilty as principals in committing the offense of purchasing and selling narcotics.

At the outset, we consider the claim of error, based on refusal to grant a new trial on the ground of newly discovered evidence. It appears that before the trial, an investigation of Beach, the chief witness for the Government, was undertaken by counsel for defendants, who made numerous inquiries, but could find no record of arrests, or anything derogatory to his character. About two weeks after the trial, however, a Mr. Barber, in the wholesale meat business at Zanesville, Ohio, wrote a letter to Mr. Day, counsel for one of the defendants at Cleveland, enclosing a Federal Bureau of Investigation finger print

record of Beach, which he had received from the Chief of Police of Chillicothe. In the letter, Barber also informed Mr. Day that the Probate Judge of Ross County, Ohio, should be interviewed with regard to the informer. The copy of the finger print record, signed by John Edgar Hoover, the Director of the Federal Bureau of Investigation, and which was made part of the motion for a new trial, showed that Beach had a record of 15 arrests for misdemeanors and crimes, including "assault (rape)," burglary, larceny, car theft, and grand larceny, in several states, over a period of more than 20 years; and that he had served several prison sentences for various felonies. Following up the letter from Barber, Mr. Day interviewed Judge Marshall Fenton of the Probate Court of Ross County, with the result that the judge gave an affidavit stating that the place of business which Beach conducted in that county had a general reputation for being a "hang-out" for law breakers; that Beach had been engaged in trying to keep juvenile, as well as adult, law offenders beyond the reach of the law, and had a very bad reputation among the law abiding citizens of the community. All of these matters were set forth in the motion for a new trial. According to Beach's testimony, he first worked for the Government in 1923, and has been so employed, "off and on," since. However, it would appear from the finger print record that he was serving a sentence in the Missouri State Penitentiary for grand larceny in 1923. He was paid $25.00 by the Government narcotic agents for bringing about the arrest of Dr. Platt.

In denying the motion for a new trial, the District Court held that there was not sufficient showing of diligence to discover the evidence, before trial; that counsel for defendants could have asked Beach on cross-examination whether he had ever been arrested and convicted; and that the court was not satisfied that if the evidence in question had been produced at the trial, the verdict would have been different. Our conclusions make it unnecessary to dispose of the question raised, but the showing made on the motion, however, illuminates other phases of the case, hereinafter discussed.

■ Dr. Platt, a physician of 28 years' experience, is a resident of Newark, Ohio. From the time that he was a small boy, he has been a devotee of horse racing. His father "did nothing but race horses"—his interests were to "breed them, train them, race them, make books." He was connected with the Thorobred Horse Racing Association. About a month before his arrest, Dr. Platt had pleaded guilty to fraudulent issuance of narcotic prescriptions in 1938, and was placed on probation. What the exact nature of the offense was, does not clearly appear from the record. .Col. Yarrick, a witness on his behalf, who had served several terms as prosecuting attorney, and an assistant attorney general of Ohio, and who was sworn as a character witness on behalf of Dr. Platt, testified that his associate in the practice of law, who had something to do with the case after the plea of guilty, regarded it, "as it was thought by every doctor, as something technical"; and the sentence imposed would indicate the offense must have been of a technical nature, or that there were considerably mitigating circumstances. Whatever the facts, a little more than a month after Dr. Platt pleaded guilty and had been placed on probation, Government narcotic agents evolved a plan to have informers call upon him in order to try to procure heroin, using as a bait, his well-known interest in horses and horse racing. George Gray, a Government agent in Columbus, Ohio, got in touch with Paul Beach, the informer. Gray and Beach then drove from Columbus to Newark, where Gray introduced Beach to one Sargent, a resident of Newark, and instructed them to go to Dr. Platt's office and attempt to purchase heroin from him. Sargent was a man well known to Dr. Platt, who had attended many race meetings with Sargent and his father. Sargent's mother had been a nurse who had been formerly employed by Dr. Platt; and the doctor had also been the physician for Sargent's wife, and had assisted at the birth of Sargent's child. It appears from the evidence that Sargent went into the doctor's office, while Beach remained outside. After a short time, Sargent came out with the doctor. Beach, the informer, testified that he then told the doctor that he wanted heroin to "soup" race horses; that he gave the doctor the names of certain horses who were to run in races, in order that the doctor could bet on them; that the heroin was to be used to stimulate them and to win the races in this manner. It is claimed that Dr. Platt said that he did not have any heroin, but that he did give Beach the name of defendant Morei, and his address in Cleveland, and told him to see

Morei and tell him that the doctor had sent him, and that "he will take care of you." It appears that Dr. Platt had formerly lived in Cleveland, where he became a friend of Morei. Denying that he had made the statement attributed to him, Dr. Platt, during the giving of his evidence, attempted to testify what his conversation with Sargent had been, and repudiated Beach's testimony, stating that heroin had never been mentioned. An offer of testimony by Dr. Platt to the effect that Sargent had merely discussed where they could lay bets on horse races, was rejected by the court as inadmissible on the ground that testimony of any conversation between Dr. Platt and Sargent was hearsay. It may be observed that the failure of the Government to call Sargent, a most important witness in view of the disputed testimony, was unexplained, and, under the circumstances, every inference and conclusion must weigh against the contention of the Government on this phase of the case.

Dr. Platt is charged as a principal under the statute that makes him so answerable, if he "directly commits any act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces, or procures its commission." These are familiar words in criminal law, and, as Judge Learned Hand observed, in United States v. Peoni, 2 Cir., 100 F.2d 401, the substance of the formula dates from the beginning of the 14th Century, and is discussed in Bracton, Coke, Hale, and Blackstone. Although the charging of those guilty of any of the offenses, as principals, is found only in recent statutes, nevertheless, in order to ascertain whether one be guilty as principal, by reason of his guilt of any of the enumerated offenses, recourse must be had to the common law which defines them.

■■■■ While the distinctions of guilt between principals, aiders and abettors, and accessories, have been abolished by statute, and all are charged as principals, and are equally guilty, a conviction under this statute must be sustained, in this case, on the ground that the accused was an aider or abettor, known formerly as a principal in the second degree; or on the ground that he was an accessory. We are not here concerned with accessories after the fact. But unless one directly commits an offense, or is an aider and abettor, or an accessory, as defined by law, he is not guilty. It is said that where the distinction between accessories before the fact and principals is abrogated by statute so that participants in the crime, who would be accessories before the fact, are called and punished as principals, it is still necessary to apply the common law rules in order to determine whether a person, who is absent when a crime is committed by another, is guilty as a principal under the statute; and that at common law an accessory before the fact is one who was not present actually or constructively, when the offense was committed, but who counseled, procured, or commanded another to commit it. People v. Owen, 241 Mich. 111, 216 N.W. 434. All aiders and abettors, and accessories, are guilty as principals according to the statute; but the language by which an accessory before the fact is made a principal and punishable as such, cannot be construed as abolishing the distinctions between, for instance, an accessory before, and after, the fact. See United States v. Johnson, 7 Cir., 123 F.2d 111.

■■■■ All who are present, aiding, and abetting, when a felony is committed, but who take no part in the actual perpetration of the felony, are principals in the second degree. *To constitute a principal in the second degree, mere presence at the crime is not enough; there must be a common purpose and intent to aid or encourage the persons who commit the crime, and an actual aiding or encouraging.* Halsbury's Laws of England, Vol. 9, § 528. "An accessory before the fact is one who, though absent at the commission of the felony, procures, counsels, or commands another to commit said felony subsequently perpetrated in consequence of such procuring, counseling, or command." Wharton, Criminal Law, Vol. 1, § 263, 12th Ed. "Those present assisting one who personally commits a felony are 'aiders and abettors,' and are guilty as principals, while those who are absent, but who counseled the commission of the crime, 'are accessories before the fact.'" Vogel v. State, 138 Wis. 315, 119 N.W. 190, 191. It is not necessary that there should be any direct communication between an accessory before the fact and the principal felon; it is enough if the accessory direct an intermediate agent to procure another to commit the felony, without naming or knowing of the person to be procured. A person is not an accessory before the fact, unless there is some sort of active proceeding on his part; he must incite, or procure, or

encourage the criminal act, or assist or enable it to be done, or engage or counsel, or command the principal to do it. Halsbury, supra, § 531. Strictly speaking, in order to constitute one an accessory before the fact, there must exist a community of unlawful intention between him and the perpetrator of the crime. The concept of an accessory before the fact presupposes a prearrangement to do the act [see West v. State, 25 Ala.App. 492, 149 So. 354]; and to constitute one an aider and abettor, he must not only be on the ground, and by his presence aid, encourage, or incite the principal to commit the crime, but he must share the criminal intent or purpose of the principal. Whitt v. Commonwealth, 221 Ky. 490, 298 S.W. 1101. If Dr. Platt is guilty of the offense charged, it is because he was an aider and abettor, or an accessory before the fact. It is true that, since enactment of statutes making aiders and abettors, and accessories, liable as principals, many courts have indiscriminately referred to accessories as aiders and abettors. In this case, such a matter is unimportant. Thus, it was said in Parisi v. United States, 2 Cir., 279 F. 253, that it is not necessary that one who aids and abets the commission of a crime, need be present when the crime is committed; but this is not entirely accurate in the strict sense of the legal definitions. In Jin Fuey Moy v. United States, 254 U.S. 189, 41 S.Ct. 98, 65 L.Ed. 214, cited in support of the statement made in the foregoing case, it was merely said that one may take a principal part in a prohibited sale of narcotics by unlawfully issuing a prescription.

■ The Government emphasizes that the statute, Cr.Code § 332, 18 U.S.C.A. § 550, provides that one who induces or procures "the commission" of an offense, is guilty as principal. This is true; but it certainly cannot be concluded that *procuring the commission* of an offense is different from "procuring an offense," or procuring another to commit an offense. It is not to be assumed that Congress, in defining as a principal, one who "procures the commission of an offense," and using almost the identical language by which the common law defined aiders, abettors, and accessories, was providing for a new crime theretofore unknown. If the criterion for holding that one is guilty of procuring the commission of an offense, is that the offense would not have been committed except for such a person's conduct or revelation of information, it would open a vast field of offenses that have never been comprehended within the common law by aiding, abetting, inducing or procuring. As Judge Hand remarked, in United States v. Peoni, supra [100 F.2d 402], "It will be observed that all these definitions have nothing whatever to do with the probability that the forbidden result would follow upon the accessory's conduct; and that they all demand that he in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed. All the words used—even the most colorless, 'abet'— carry an implication of purposive attitude towards it." Appellee cites Collins v. United States, 5 Cir., 65 F.2d 545, in which it was said that one must be considered as having aided and abetted the commission of a crime if what he did made possible, and tended to cause, its commission. But this is broad language and is susceptible of misconstruction. That case involved a sheriff and his deputy, who, knowing of illegal transportation of intoxicating liquor, agreed to protect the persons distributing it; and the cases cited by the court, in support of its statement of the rule, all involved parties who, under common law, would be liable as aiders and abettors, or accessories. Jin Fuey Moy v. United States, supra; Hume v. United States, 5 Cir., 118 F. 689; Billingsley v. United States, 9 Cir., 249 F. 331; Colbeck v. United States, 7 Cir., 10 F.2d 401; Cook v. United States, 8 Cir., 28 F.2d 730.

■ Of the charge that he was guilty of purchasing and selling narcotics, based on the theory that he had aided and abetted, or was an accessory before the fact, in the commission of these acts, there was no evidence to convict Dr. Platt. The court dismissed the conspiracy count. There was no evidence that Dr. Platt planned with the other defendants or conspired directly or indirectly with them, or had any understanding with Morei to buy or sell narcotics. There was no community of scheme between him and the other defendants. They shared in no common intent or plan, nor was there any prearrangement or concert of action. Dr. Platt was paid nothing and it is not claimed that he ·asked for any remuneration or expected to receive anything from the claimed transaction. Accepting the facts

as contended for by the prosecution—which are squarely contradicted by the defendant—the only thing Dr. Platt did was to give Beach the name of Morei as a man from whom he might secure heroin to dose horses in order to stimulate them in racing. This is not the purposive association with the venture that, under 'the evidence in this case, brings Dr. Platt within the compass of the crime of selling or purchasing narcotics, either as principal, aider and abettor, or accessory before the fact.

■ It appears now to be contended by the Government, especially since the court dismissed the conspiracy count, that if Dr. Platt was not guilty of aiding and abetting Morei, nevertheless, he aided and abetted the informer Beach. No fair reading of the indictment would warrant the conclusion that he was charged with aiding Beach. The first count sets forth purchase by defendants Morei, Evans, Platt and Russo. The second count charges sale by Morei, Evans, Platt and Russo, to Paul Beach. But it would make no difference, in our opinion, whether Dr. Platt had been properly charged in the indictment with aiding Beach. Giving Beach the name of Morei, under the circumstances of this case, and with no further connection with the offense, would not render Dr. Platt guilty of aiding and abetting Beach, or of being his accessory before the fact. Under the evidence, as a matter of law, the motion to direct a verdict of not guilty should have been granted.

The conviction of defendant Platt is reversed.

The conduct of the Government agents is subject to severe condemnation in their efforts to have Dr. Platt sell narcotics to informers in this case. He had been placed on probation for issuing illegal prescriptions only a month before; and while his previous offense may have been technical, it is to be assumed that the court, through its probation officers, was concerned with direction and encouragement to him to avoid occasions and further temptation of law violation. Nevertheless, with the probation officials on one side, engaged in the supervision of work of correction, the narcotic officials, at the same time, knowing of his horse racing proclivities, were using his own patients to try and have him violate the law by offering temptations to him to make large sums of money on racing, if he would procure heroin, with which, they represented, they could dose race horses—after giving him the names of the horses that would win. It is to be further observed that from the time that Dr. Platt was placed on probation, there was no evidence whatever of any cause for the belief of the narcotic officials that he was engaged in the violation of any law, or that he had any intent of further law violation. Yet, under such circumstances, these officials, with an overly zealous and mistaken conception of their duties, deliberately set out to buy narcotics from him by means of extravagant inducements. Such conduct is well calculated to bring law enforcement into contempt and disgrace.

The defense of Morei was entrapment.

After Beach saw Dr. Platt, he and Gray, the narcotic agent, proceeded to Cleveland. Beach went out to the locality where Morei had his place of business, and after being shaved in a near-by barber shop, made inquiries about Morei and was informed that he would probably soon be about the streets in that vicinity.

Morei, at the time of the trial, was 49 years old, married, and the father of a child. His business consists of a variety of small dealings, including the servicing of gum machines, sale of washing machines, tires, refrigerators, batteries, as well as selling, at times, odd lots of remnants and slightly damaged apparel. He has a small room, with a desk and telephone, where he keeps his machines and the goods he sells. His eyesight is bad, due to a condition of tubercular origin, and he has less than one per cent normal vision in each eye. To help him in his business, he employed defendant Evans, paying him $10.00 a week to drive his car as chauffeur, and to service the gum machines, which consists in removing the money and supplying gum for them. Much of Morei's business is apparently carried on around street corners and in neighborhood drug stores, restaurants and taverns.

When Morei was pointed out to Beach as the man whom he was seeking, Beach called to him, addressing him as "Pete," and said that he wanted to see him a moment. He showed him Dr. Platt's prescription blank, with Morei's name on it, discussed horse racing, and said that he had a proposition to make a lot of money in betting on horses that had been given heroin to stimulate them. He told Morei that he wanted some heroin to "fix"

horses, and that Dr. Platt had told him to be sure and give Morei the names of the horses and that Morei would get a bet on them. Beach said that he had two good horses that were running on Wednesday and Thursday of that week; that he wanted to lay some bets and needed some heroin so "the horses would be ready to go." Beach further testified that he told Morei, "There is big money to be made on hot race horses." Morei's testimony is undisputed that Beach told him that "we had one horse last month that paid $109.00 for $2.00"; that "they had got the limit, which would be 20 to 1 in betting"; that the horses could not run "cold"; that they needed heroin. He also told Morei: "If you can fix me up, I will give you a couple of good horses"; and to "bear in mind you are going to make big money if you stand by me." Beach further testified: "I told him I was a life member of the Elks. * * * I told him he had nothing to be afraid of and I would always remember what a good friend did for me."

It is to be observed that the foregoing is taken from the testimony of Beach and the undisputed testimony of Morei. Beach testified, however, on cross-examination, that when he gave Morei the prescription slip with Dr. Platt's name written thereon, and told him he wanted heroin, Morei immediately answered that he could get it and it would cost $110.00 an ounce; and that "it was just a question of asking for the heroin, and giving him the money, and his delivering it." This conclusion of the witness is so contrary to his admitted testimony of the inducements and incitements which he made to get Morei to procure the drug, as to bear the stamp of downright dishonesty. On direct examination, Beach testified that when he first met Morei: "I told him I wanted to use it to fix a horse, and the doctor told me to be sure to give 'Pete' (Morei) the horses' name, or names, and Pete would get a bet down on them." On cross-examination, when pressed, Beach apparently felt that he had emphasized the betting inducement too favorably for Morei, and he then testified in complete contradiction: "I did not tell him Dr. Platt told me if I came to Morei he would place a bet on these horses."

Morei did not have any heroin in his possession. After the first meeting with Beach, he met him the following noon, and again at night, when they had dinner together. Beach had given Morei $110.00

that afternoon to purchase the drug. In some way Morei made arrangements to procure it; and it was delivered by Russo on a dark street at night, when Morei and Beach were driven to a rendezvous by defendant Evans. Morei testified that he had never previously discussed narcotics, and had never sold them before in his life. There was no evidence of his previous connection with the traffic, nor of any complaints made with reference to him. Dr. Neary, a physician and surgeon associated with St. Vincent's Hospital, and assistant professor of Surgery at Western Reserve University, testified that he had known him approximately 20 years and that his reputation as a law abiding citizen was very high. Mr. Tanno, a manufacturer and jeweler, testified to like effect. This evidence of good character was not questioned by the Government.

 Entrapment is seduction or improper inducement by law enforcement officers to commit a crime. United States v. Wray, D.C., 8 F.2d 429. The gist of the entrapment is that the agent manufactured the offense and then incited the accused to commit it for the purpose of prosecution. Swallum v. United States, 8 Cir., 39 F.2d 390. In United States v. Certain Quantities of Intoxicating Liquors, D.C., 290 F. 824, 826, the court said that in this class of case, in order to warrant a conviction, there must be present: "(1) Reasonable suspicion on the part of the officers that the party is engaged in the commission of a crime or is about to do so; or (2) The original suggestion or initiative must have come from the perpetrator." In Butts v. United States, 8 Cir., 273 F. 35, 38, it was said: "When the accused has never committed such an offense as that charged against him prior to the time when he is charged with the offense prosecuted, and never conceived any intention of committing the offense prosecuted, or any such offense, and had not the means to do so, the fact that the officers of the government incited and by persuasion and representation lured him to commit the offense charged, in order to entrap, arrest, and prosecute him therefor, is and ought to be fatal to the prosecution, and to entitle the accused to a verdict of not guilty." In United States v. Echols, D.C., 253 F. 862, the court said:

"It is clearly the law that, while it may be true that the mere aiding of one in the commission of a criminal act by a govern-

ment officer, or agent, does not preclude the conviction of the party committing the crime, yet, where the officers of the law have incited or induced the commitment of the crime, and lured the defendant on to its commission, the law will not authorize a verdict of guilty. * * * This rule does not proceed from or rest on any limitation of the right of the officers of the law to obtain evidence of crime in any manner possible, nor is it a defense to a prosecution that the officer participated in the commission of a crime, if the genesis of the idea, or the real origin of the criminal act, sprang from the defendant, and not from the officer * * *. But this statement in no manner authorizes government officers, employed to prevent crime and apprehend criminals, to thus conceive and set on foot the commission of an offense merely in order to make an arrest."

In Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 218, 77 L.Ed. 413, 86 A.L.R. 249, the accused was prosecuted for the illegal sale of liquor. An agent of the Government, posing as a tourist, visited the defendant at his home in North Carolina. He ascertained that the defendant was a veteran of the World War and a *former member of the 30th Division of the* A. E. F. The agent then informed the defendant that he, also, was a member of the same division, which was true; and asked the defendant if he could get him some liquor. Defendant said that he did not have any and, later, the agent made a second request, without result. After some conversation about their war experiences, the agent again made the same request, whereupon the defendant left his house and, after a few minutes, came back with a half gallon of liquor, for which he was paid $5.00. The testimony of three witnesses was to the effect that the defendant had a general reputation of being a rumrunner. Defendant, on the other ,hand, introduced evidence of his good character. In reversing the conviction and granting a new trial, a majority of the Supreme Court held that the trial court had erred in not submitting the defense of entrapment to the jury. But Justice Roberts, in his dissent, in which he was joined by Justice Stone, now Chief Justice, and Justice Brandeis, held that the judgment should be reversed, and the defendant discharged on the proof of entrapment, and stated that the fact that the defendant had a bad reputation or had been previously guilty of committing offenses, would not justify the instigation of a new crime as a means to reach and punish him for past misdeeds. In his opinion, Justice Roberts said: "Proof of entrapment, at any stage of the case, requires the court to stop the prosecution, direct that the indictment be quashed, and the defendant set at liberty. If in doubt as to the facts it may submit the issue of entrapment to a jury for advice. But whatever may be the finding upon such submission the power and the duty to act remain with the court and not with the jury."

It is unnecessary further to review the law or observe the various shades of opinion upon the subject of entrapment. Each case must be governed to a large extent by its own facts. In this case, the evidence disclosed that Morei had a good reputation. No effort was made to challenge and rebut the testimony of his good character. There was no evidence that he had ever been engaged in the narcotic traffic or any other criminal transactions; and there was no reasonable cause to believe that he was engaged in the narcotic traffic. With the removal from the case of the testimony of Beach, that Dr. Platt had sent him to Morei as a man who would "fix him up"—which was inadmissible under the issues, as to Morei—even the officers would have had no ground for the slightest speculation as to whether he would respond to their solicitation. They ascertained that he was a great friend of the doctor, and that "he would do anything in the world for Dr. Platt." The Government agents were the ones that caused Morei to have the drug in his possession.

From an examination of the evidence, it is our conclusion that it was fully proved by defendant that the criminal design originated with the agents of the Government, and that they implanted in the mind of Morei the disposition to commit the offense, as well as lured him on by inducements of the great sums of money he could win by betting on horses that had been dosed with heroin. The fact that he secured the heroin only proves that he yielded to temptation because of the extravagant inducements of the Government informer. There would be no such thing as entrapment unless a party had committed the offense charged. That he was able to secure the drug is not in itself startling. There are doubtlessly many people who live on the seamy

side of the life of the great cities, innocent of association with crime and without criminal proclivities, who, nevertheless, in their lives and experience about the streets, have a pretty good idea of where narcotics could be obtained. But this is of no consequence, in any event, if Morei was seduced by the representatives of the Government into illegal conduct. The record substantiates the defense that Morei was entrapped into committing the offense charged. Under the circumstances disclosed by the record, Morei's motion to direct a verdict of not guilty, should have been granted. His conviction is reversed.

 Defendant Evans worked at the gasoline station across the street from the drug store and adjacent to the restaurant that have been mentioned as the meeting places of Morei and Beach. In addition, he earned $10.00 a week as helper and chauffeur for Morei, who could not drive his car because of bad eyesight. Evans' alleged connection with the crime is based upon the testimony of Beach, to the following effect: On the afternoon of the day following Beach's first conversation with Morei, Beach and Morei went to a drug store. Evans was there. Morei asked Evans to put in a telephone call to Youngstown for him. Evans went to the booth and after getting the call through, Morei spoke to some party. Beach was standing near, and although he said he "didn't hear a lot of the conversation," he knew Morei was calling Youngstown. After the telephone conversation, Beach said that Morei came out and said. "It's all right," and then told Evans to go to Youngstown. Evans' testimony on this point was that Morei had told him to go to Youngstown to pick up certain sample dresses, and, in this, he is not disputed. Thereafter, Morei told Beach to return about six o'clock, and "he would have the stuff." Beach does not say that Evans heard this statement about "the stuff," or was present when it was made; and the testimony of Evans that he did not see Beach in the drug store, nor even know that he was present, is not controverted. When Beach returned to the restaurant, he ordered dinner and waited for Morei, who later came in and accepted Beach's invitation to have dinner with him. Apparently, Evans was late in returning from Youngstown and when he came to the restaurant, he said to Morei: "No score." Morei got up from the table, walked away and talked with Evans; and

they both left Beach for a few moments. "Then Pete (Morei) came back in and told me to come on. * * * When he came back, he said 'Come on and we will get it. * * *' When he came back in *with Evans the last time,* he said: 'Come on with me.'" While the testimony of agent Gray differs from that of Beach with regard to the foregoing, as well as from that of Evans, which seems the most consistent, it is unimportant in the determination of this case. There is no evidence that Evans was present when anything was said about "the stuff"; and wherever it is clear that Evans was present with Beach and Morei, there is nothing in the remarks that were made that would indicate that the men were speaking of narcotics. Evans testified, without contradiction, that he had never spoken to Beach or Morei about narcotics; had never handled narcotics for anyone; and that he didn't know that they had narcotics in the car. Morei testified that he had never talked to Evans about narcotics. The only testimony of Beach upon this subject is that, while Evans was driving him downtown, after Morei had secured the drug and after Morei had left the car, Beach "talked" with Evans "about heroin." The foregoing evidence is not sufficient to warrant the conviction of Evans for the crime of selling narcotics, on the theory that he aided and abetted its commission.

The Government appears to rely upon allegedly insinuating circumstances with references to the telephone call to Youngstown and the trip that Evans made to that place, and back, on the afternoon of the day on which the heroin was procured. Morei testified that he had previously secured samples of some used and damaged dresses from a man named Palucci; that he was making efforts to find a market for the sale of a large number of similar dresses; that he had talked over a possible deal with the proprietor of the Knife and Fork Restaurant in Youngstown and that this man told him that he would buy a quantity of the dresses if they were "passable"; that Morei had sent Evans over with six of the dresses; and on October 15th had sent him over to bring them back, or get an order. Evans testified that he had taken the dresses down the week before and that he had made the trip to Youngstown and back on the day in question, solely to get the dresses from the proprietor of the Knife and Fork Restaurant. He returned to

Cleveland about six o'clock. The six dresses were in the automobile when Evans was arrested a few hours later. They were marked "sample dresses." When Evans was arrested in front of the Gillsy Hotel, where he had taken Beach upon his request, he stated to agent Bowman of the Federal Narcotics Bureau, one of the officers making the arrest, that he had gone to Youngstown to pick up the package of dresses from the Knife and Fork Restaurant, had secured the box containing the dresses, and had arrived back in Cleveland about six o'clock. It is impossible to say what the Government contends with reference to the Youngstown incident. If the restaurant owners are innocent of any connection with the offense, this evidence is irrelevant. If it were claimed—which it is not, except possibly by innuendo—that persons at the Youngstown restaurant were arranging for the sale of the drug, there is no evidence that Evans knew of it. The Federal officers knew immediately upon Evans' arrest, what he claimed with reference to the trip to Youngstown. It does not appear that any inquiry was directed by the Government to the Youngstown restaurant; and if it were, the Government apparently concluded that there was no evidence regarding the affair worth submitting to a jury, even under the conspiracy count, which was later dismissed. As far as Evans is concerned, the entire Youngstown matter is merely suspicion.

The fact that Evans drove the car; that he stopped it in the dark on a side street; that he drove it back to the hotel with Beach, who had secured the heroin—these circumstances, standing alone, or with the other evidence in the case, are not sufficient for conviction. In some cases, inferences can be drawn that one who drives an automobile in which narcotics are being transported, knows of that fact; or that one driving an automobile used in the commission of a crime, is likewise aware of that fact. But inferences of guilt cannot be drawn against the conduct of Evans in this case, in view of the fact that an informer was present, and testified as to everything Evans did or said during the whole affair; and the facts thus disclosed by the adverse Government witness, are contrary to the inferences of guilt now sought to be drawn by the Government. It is admitted that Evans was an employee of Morei; that Morei engaged him to drive the car according to his directions. It is likewise conceded that on the night in question, Morei gave all the directions for the driving of the car, and where he wished to be driven, and that Evans was acting as his chauffeur at the time. No inferences of guilty knowledge on the part of Evans can be drawn from these facts. Beach had no conversation with Evans on the way out to get the heroin or at any time before that. Morei and Beach were riding in the back seat. Evans testified that he never discussed narcotics with Morei. There is no evidence that Beach or Morei mentioned narcotics to Evans or to each other on the trip in question. On Morei's instructions, Evans stopped the car on a dark street; it was night, in the middle of October. When Morei brought the package back, he tossed it into the back seat before he got in. Evans was in the front seat, driving. It was dark. No claim is made that Evans saw the package. The fact that Beach, the informer, was present and testified to these circumstances, prevents the drawing of inferences contrary to the facts and circumstances, as disclosed by him.

Although Beach, the informer, was in the midst of all the meetings and conversation between Evans and Morei during the day and night up to the time the heroin was secured, except for a moment before leaving for the scene of the delivery of the package, and although he was in their company during the trip out and back, he was unable to testify of any instance in which the object of the trip was mentioned to Evans, or in which Evans disclosed, directly or indirectly, guilty knowledge. Evans is presumed to be innocent. That he was the employee of the man who bought the heroin; and that he was close to the scene of the crime, is entirely explicable and consistent with his innocence; and there was no other evidence sufficient to overcome the presumption. Suspicion is not such evidence. Laying aside unjustified and speculative inferences, a careful consideration of all of the evidence in this case relating to defendant Evans, leads to the inescapable conclusion that, in going to Youngstown and back, and in driving the two men to the rendezvous arranged by Morei, and in all of the other situations as disclosed by the record, he conducted himself exactly the same as he would have done had he been engaged in legitimate employment.

In reviewing criminal convictions, we do not pass upon the weight of the evidence. That is for the jury. But in this case, there was no evidence against Evans to warrant submission of the question of his

guilt to the jury; and his motion to direct a verdict of not guilty should have been granted.

In accordance with the foregoing, the convictions of Evans, Morei, and Dr. Platt are reversed and the cases remanded to the District Court for a new trial, in conformity with this opinion.