**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John L. CARROLL, Defendant-Appellant.**

**No. 74–1938.**

United States Court of Appeals, Sixth Circuit.

June 12, 1975.

George C. Steinemann, Steinemann, Zeiher, Beamer & Schell, Sandusky, Ohio, for defendant-appellant.

Frederick M. Coleman, U. S. Atty., Frank A. Justen, Asst. U. S. Atty., Toledo, Ohio, for plaintiff-appellee.

Before MILLER and LIVELY, Circuit Judges, and McALLISTER, Senior Circuit Judge.

LIVELY, Circuit Judge.

The defendant who is a physician appeals from a jury conviction on six of ten counts for distribution of Seconal, a Schedule III controlled substance, in violation of 21 U.S.C. § 812 and § 841(a)(1). It is claimed that four separate errors occurred at the trial which require reversal of his conviction.

The first claim of error is that the prosecution failed to prove that Seconal (sodium secobarbital) is a controlled substance, the distribution of which is prohibited by 21 U.S.C. § 841(a)(1). It is provided in Section 812(c), Schedule III, Part (b)(1), that "[a]ny substance which contains any quantity of a derivative of barbituric acid, or any salt of a derivative of barbituric acid" is a controlled substance. There was expert testimony that Seconal is a barbituric acid which is controlled under Schedule III. This evidence was sufficient to establish that the substance which defendant distributed was among those covered by the statute.

The second contention presented on appeal is that the government was guilty of entrapment and that the defendant was entitled to a directed verdict of acquittal. It is maintained that defendant had no predisposition to violate the law, but that the plan originated with the government agents who induced him to make illegal sales. See *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). It is also asserted that the agents deceived the defendant and misled him into believing that he was being requested to help persons who had a real need for the drugs which he prescribed. It is undenied that the agents in this case used deception in dealing with defendant, but such activity is not forbidden, *United States v. Russell,* 411 U.S. 423, 435–36, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), and does not, without more, establish entrapment as a matter of law. The District Judge instructed the jury fully on the defense of entrapment. He correctly held that entrapment had not been proven as a matter of law and the issue was properly submitted to the jury. *United States v. Head,* 353 F.2d 566 (6th Cir. 1965); *United States v. Williams,* 319 F.2d 479 (6th Cir. 1963).

The third assertion of error deals with the instructions by which the court defined the criminal offense which the defendant was charged with committing. The court originally read portions of 21 U.S.C. § 841(a)(1) to the jury as his charge on the elements of the crime and then gave the statutory definitions of "dispense" and "practitioner." The jury, after deliberating some time, asked for a clarification with respect to § 841(a)(1) in a written communication to the court. The jury was then called into the courtroom and the following proceeding occurred:

THE COURT: Ladies and gentlemen, the Bailiff handed me a question and I want to read it to you to be sure I have it right. It says:

"WHAT DOES TITLE 21, U. S. CODE SECTION 841(a)(1) STATE.

"WE CANNOT REMEMBER YOUR SYNOPSIS OF THIS PARTICULAR ITEM."

That is your question, is it?

JURORS: Yes. Yes. Yes.

THE COURT: Ladies and Gentlemen, the prosecution in this case is based upon the statute in Title 21, United States Code Section 841(a)(1), which reads, in pertinent part, as follows:

"Except as authorized by this subchapter, it shall be unlawful for any person knowingly and intentionally to distribute or dispense a controlled substance."

"The term 'dispense' means to deliver a controlled substance to an ultimate user by, or pursuant to the lawful order of, a practitioner.

"The term 'practitioner' means a physician or other person licensed, registered, or otherwise permitted by the United States or the jurisdiction in which he practices, to distribute, dispense, or administer a controlled substance in the course of professional practice.

"The term 'distribute' means to deliver . . . a controlled substance to the possession of another person, which in turn means the actual, constructive, or attempted transfer of a controlled substance
· · ·

"You instructed as a matter of law that seconal is a controlled substance." [sic]

Does that answer your question, Ladies and Gentlemen?

JURORS: Yes. Yes. Yes.

THE COURT: Very well.

FOREMAN: Are there any *exceptions* or generalities that should be mentioned? (emphasis added).

THE COURT: I can perhaps add a couple of definitions from the statute. I can't go beyond the language of the statute.

"The term 'administer' refers to the direct application of a controlled substance to the body of a patient by a practitioner or in his presence by his authorized agent."

"The term 'deliver' or 'delivery' means the actual, constructive, or attempted transfer of a controlled substance, whether or not there exists an agency relationship."

I have defined the term 'dispense' and the term 'distribute.' There are a couple more definitions. I have defined the term 'practitioner' to you.

"The term 'ultimate user' means a person who has lawfully obtained, or who possesses, a controlled substance for his own use or for the use of a member of his household . . or for a member of his household . . . ."

FOREMAN: If you would, please, just reread the first part of what you read to us a second ago, the first thing you read, and I think that will clear up all the questions of the Code.

THE COURT: That is the Code Section. Title 21, United States Code Section 841(a)(1), which reads, in pertinent part, as follows:

"Except as authorized by this subchapter, it shall be unlawful for any person knowingly and intentionally to distribute or dispense a controlled substance."

FOREMAN: A little bit more. Continue.

THE COURT: "The term 'dispense' means to deliver a controlled substance to an ultimate user by, or pursuant to the lawful order of, a practitioner.

"The term 'practitioner' means a physician or other person licensed, registered, or otherwise permitted by the United States or the jurisdiction in which he practices, to distribute, dispense, or administer a controlled substance in the course of professional practice."

Does that cover it?

JURORS: Yes. Yes. Yes.

THE COURT: Very well, ladies and Gentlemen. I will excuse you to resume your deliberations.

\*    \*    \*    \*    \*    \*

Prior to the original charge to the jury and again prior to the supplemental charge, counsel for the defendant requested the court to instruct specifically that as a physician the defendant had the right to prescribe controlled substances including Seconal and that it would be a violation of Section 841(a)(1) for him to prescribe such substances only if it were done outside of the physician-patient relationship. The court declined on both occasions to give such an instruction, relying on the language of the statute alone.

Though the court read to the jury the statutory definition of "practitioner" as a physician or other person licensed to dispense or administer controlled substances, it did not advise them that physicians are exempt from the provisions of the drug abuse statute when they dispense or prescribe controlled substances in good faith to patients in the regular course of professional practice. This is the obvious intent of Congress when the entire subchapter, of which § 841(a)(1) is a part, is considered. Specifically pertinent are the provisions of § 829(b) which relate to physicians and others licensed to dispense controlled substances. *United States* v. *Collier,* 478 F.2d 268 (5th Cir. 1973). The instructions as given by the court in this case failed to inform

the jury of this fact, even though the jury specifically asked about "exceptions." Though it arose under a somewhat different statute then in effect, the instruction approved by the court of appeals in *White* v. *United States,* 399 F.2d 813, 816–17 (8th Cir. 1968), correctly states the rights of a physician under the present Act. Failure to give such an instruction was prejudicial error.

■ The fourth allegation of error relates to the punishment imposed by the district court. No justification has been shown for departing from the rule that when a sentence is within the statutory range it is not subject to review. *United States* v. *Gargano,* 338 F.2d 893 (6th Cir. 1964), *cert. denied,* 380 U.S. 962, 85 S.Ct. 1106, 14 L.Ed.2d 153 (1965).

The judgment of the district court is reversed, and the case is remanded for a new trial.

McALLISTER, Senior Circuit Judge (dissenting).

Appellant Carroll, a medical doctor of Sandusky, Ohio, was convicted of dispensing a controlled substance (Seconal) in violation of Title 21, U.S.C.A., Section 841(a)(1). There were ten counts based upon the same alleged violations, the first four counts being founded on dispensing the controlled substance on October 16, 1973, and the last six counts based on dispensing the controlled substance on October 18, 1973. The defenses were entrapment and failure of the trial court to correctly charge the jury, or in such a way that they could not understand the charge.

The defendant, Dr. John L. Carroll, was found not guilty, in spite of the attempts of government agents, who thought they had entrapped him into committing a crime on *October 16, 1973,* but was convicted of violation of the Act

in dispensing the controlled substance on *October 18, 1973.*

Dr. Carroll's defense to the charge that he violated the Act on October 18, 1973, was not guilty, and that the government agents had tried (if he was not guilty) to entrap him into dispensing the controlled substance on October 18, 1973, after he had been found not guilty of dispensing the controlled substance on October 16, 1973.

It may be observed that this case is concerned with the dispensing of a remedy for insomnia. All the requests by the government undercover men were for remedies for sleeplessness, or loss of sleep, for which Seconal capsules, a sedative, are frequently prescribed as a common remedy. Insomnia is a "subjective" illness. It cannot be detected by medical methods or examination, but no one questions that it causes great distress. Insomnia is medically described as "inability to sleep, abnormal wakefulness." Dorland's Medical Dictionary, 25th Edition. In Cecil-Loeb's Textbooks of Medicine, Beeson McDermott, page 96, it is stated:

"Too little sleep is known as insomnia or hyposomnia. Insomnia * * * most frequently results from something other than structural diseases of the nervous system * * *. Insomnia has three patterns: difficulty in falling asleep after retiring; intermittent waking through the period of attempted sleep; and early awakening. Direct observation on patients suffering from insomnia almost always reveals they are less wakeful than they think and there is little evidence that chronic insomnia takes any physical toll. Nevertheless, even brief difficulty in falling asleep, or staying asleep, causes great subjective distress, leads to a large consumption of sedatives in the United States." [1]

1. In 1946, during the height of the "cold War," when Great Britain was in great difficulty with Russia after the cessation of the conflict, one of the great English statesmen, Sir Stafford Cripps, an international authority and cabinet member, who had been hospitalized in Switzerland the previous year, wrote Prime Minister Clement Attlee, who was in the midst of the work of the decolonizing of India:

"Zurich—August 30, 1946.
My dearest Clem:
Thank you so much for your dear letter—It was very nice of you to find time to write.

The only alleged violations of the Act in the indictment of ten counts were that, in the first four counts thereof, Dr. Carroll was charged with dispensing a controlled substance on October 16, 1973, in violation of the Act; and in the last six counts he was charged with dispensing a controlled substance on October 18, 1973, in violation of the Act. The controlled substance was in all cases Seconal.

Congress was not faced with the matter of "controlled substances" until 1970, probably because so many new drugs had, in recent years, come into existence; and, therefore, had provided no standards or guidance to the prescription or dispensation of controlled substances by medical doctors, who were authorized by the new Act to prescribe for them. This may have been done deliberately because of the difficulty of setting forth standards or guidelines for prescribing and dispensing such new drugs; or Congress felt it was too difficult to take up this subject, which they preferred to confide to experts, in the category of medical doctors, the discretion to prescribe the new controlled drugs. In any event, the subject is new, and the present case arose only two and a half years after the enactment of this complicated legislation.

The only violations of the Act charged in the first four counts were: (1) That Doctor Carroll had, on October 16, 1973, unlawfully dispensed or caused to be distributed the controlled substance to Herbert Fischner, an undercover agent of the Ohio State Medical Board; (2) That he had caused the said substance to be unlawfully dispensed to Robert Cole, an undercover agent of the Department of Justice; (3) That he had caused the said substance to be unlawfully dispensed to Kenneth McNamara, an undercover special agent for the United States Customs, and (4) That he had caused, *for the second time,* the said substance to be dispensed to the said Kenneth McNamara.

According to the evidence, the foregoing were the only persons to whom Dr. Carroll caused the controlled substance, Seconal, to be dispensed, or distributed, on October 16, 1973. The jury found that Dr. Carroll was not guilty of violating the Act in prescribing the controlled substance for any of these men on the first four counts, although the government agents had admitted they had tried to entrap him and they still insisted he was guilty of violating the Act.

The last six counts of the indictment upon which Dr. Carroll was found guilty charged: (1) Prescribing 200 Seconals for undercover agent McNamara; (2) Prescribing 200 Seconals for one Charles Banks; (3) Issuing two prescriptions each for 100 Seconals for Ronald Tomcek, and (4) Issuing two prescriptions each for 100 Seconals for Kenneth Francen, or a total of six prescriptions. These are the only prescriptions for Seconal in this case that Dr. Carroll wrote on October 18, 1973, and, therefore, constitute the last six counts of the indictment on which Dr. Carroll was found guilty. All persons requesting Dr. Carroll to write the various prescriptions for Seconal in this case had been found guilty of entrapping Dr. Carroll in various of the ten counts of the indictment.

We revert then to the essential facts and elements of the case. Dr. John L. Carroll, a physician seventy years of age, has been in the general practice of medicine in Sandusky, Ohio, for forty-three years. He is married, and is the father of six children: Dr. John L. Carroll, Jr., a neuro-surgeon, practicing in Ohio; Thomas, a dentist, practicing in Sandusky; James, an accountant, in Cleveland; Richard, a medical doctor, doing his internship in the General Hospital in Cincinnati; Margaret Ann, a dietician,

I have at last broken the insomnia, and all should proceed well now, and I hope to return on the 10th. * * *

Yours,

Stafford"

"A Prime Minister. Remembers," the war memoirs of the Rt. Hon. Earl Attlee, by Francis Williams, Heinemann, London 1961.

who no longer practices because she is married and has four children; and Rita, a school-teacher. On cross-examination, Dr. Carroll was asked whether he had put his six children through college. He said he had; that it had cost a lot of money to do so but that, by hard work throughout all these years, he had accomplished this rather remarkable feat for a doctor practicing in Sandusky. During all of these years, Dr. Carroll practiced without having an office girl, and kept all his own medical and personal records, and records for the Government, none of which were questioned. During Dr. Carroll's forty-three years of medical practice, there were never any insinuations, claims, or suggestions of improper medical conduct against him. He had an unblemished name and reputation and was a man of unquestioned high character.

In 1972, Dr. Carroll was awarded a plaque for forty-two years of faithful service. Dr. Carroll testified that he did not authorize a prescription for anyone over the telephone who was a stranger to him, except that he would order penicillin for a patient with a certain disorder, or if a baby were sick, he would order something for diarrhea. Aside from calling the drugstore and ordering some penicillin, or medicine for diarrhea, Dr. Carroll, in his forty-three years of practice, never authorized a prescription over the telephone for drugs, narcotics, or sleeping pills.

However, as Dr. Carroll was approaching the end of an honorable professional and personal life, three undercover men employed by the Government in what one of our great judges has termed a similar method to be "a dirty business,[2]

got together and conspired to try to find him guilty of violation of the law and to ruin his reputation and, by representing that they were suffering from insomnia, persuaded Dr. Carroll to prescribe Seconal sleeping pills for them, and later for three truck drivers of one of them, who used pep pills during the day and could not sleep at night. These undercover men had never seen Dr. Carroll and knew nothing about him, and all of their statements that they were suffering from insomnia were false. Their claims were that they did not induce or persuade Dr. Carroll to prescribe for them, but that he did so because he had a preexistent intent to prescribe dangerous drugs in order to engage in a money-making business of selling such drugs illegally, concerning which alleged intent all of the undercover agents were ignorant, and had never heard of such an intent on the part of Dr. Carroll, or anything from which such an intent could be inferred. If Dr. Carroll proves that the Government initiated the crime, the burden is on the Government to show that Dr. Carroll had the propensity to commit it. *United States* v. *Weiser,* 428 F.2d 932 (1969) (C.A. 2).

All of the undercover agents were men of importance and standing, and whose manner and address were of the kind likely to impress an intelligent and sophisticated citizen. The first to approach Dr. Carroll was Herbert Fischner, employed by the Ohio State Medical Board; the second was Kenneth McNamara, Special Agent for the United States Customs, the third was Robert Cole, a Special Agent of the United States Department of Justice, Drug Enforcement Division, with headquarters in

**2.** In *Olmstead* v. *United States,* 277 U.S. 438, 470, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928), in an opinion by Chief Justice Taft, with Justices Holmes, Brandeis, Stone and Butler dissenting, Justice Oliver Wendell Holmes, in his opinion for reversal on the ground that the evidence for a conviction was obtained by wiretapping, declared:

"For those who agree with me, no distinction can be taken between the government as prosecutor and the government as judge.

If the existing code does not permit district attorneys to have a hand in such dirty business it does not permit the judge to allow such iniquities to succeed."
See also "Holmes-Pollock Letters," Volume II, page 222, edited by Mark DeWolfe Howe, Harvard University Press, Cambridge, Massachusetts, 1941; "The Mind and Faith of Justice Holmes," by Max Lerner, Little Brown and Company, Boston, 1943.

Cleveland, Ohio. They all held these comparatively high offices in their respective callings and, obviously, appeared men of intelligence, capacity, courtesy, generosity, and were especially munificent when concerned with the malady and distress of their employees—until Dr. Carroll suddenly learned, subsequently, that they were liars and fakers in government pay, seeking out innocent people, and conspiring and scheming a plan of pretended geniality and friendship in order to arrest him. This, Dr. Carroll realized in the retrospective illumination of his perception when he found that by their feigned friendship and pretended insomnia during two days, they procured a prescription of 100 Seconals for McNamara's insomnia, and five prescriptions for his truck drivers whom he described as in the most dire need because of their malady of sleeplessness, so distant from towns, and those towns without physicians, that they could not procure any sleeping pills—for all of which Dr. Carroll was indicted. It is to be remarked that none of the undercover agents would appear to a doctor of reasonable intelligence to be a "doper," a "peddler," or one engaged in the dirty business of trying to arrest a doctor, whom they did not know, had never met, and had no suspicion that he was an illegal purveyor of drugs—because of their persuasiveness in telling falsehoods about their own serious insomnia.

The prescriptions began on October 9, 1973, when a man named Fischner, an undercover man for the Government, called upon Dr. Carroll at his office and told him he was having considerable trouble with sleeplessness. He said that he would go to sleep, wake up, and couldn't get his rest at night, and he asked the Doctor if he would prescribe Seconals for him for his sleeplessness. He told the Doctor that his own doctor had come from some little town and left his town, and that he was not able to get any Seconals there, and he thought that while he was in this part of Ohio, if Dr. Carroll could help him out, he would certainly appreciate it. Dr. Carroll asked him where he was from and Fischner replied that he was from Utica, Ohio.

Under the law, at the time the undercover man called on him, Dr. Carroll could have given him a prescription that could have been refilled five times, and could have prescribed any number of pills in each prescription. The usual amount of Seconals prescribed was 60 for a month—2 to be taken each night. Dr. Carroll prescribed 60 Seconals for Fischner. Fischner said the next time he came, he would bring his brother-in-law.

On October 16, 1973, Fischner returned to Dr. Carroll's office accompanied by another man, McNamara, whom Fischner introduced as his brother-in-law, which was a lie. Fischner told Dr. Carroll that his brother-in-law, McNamara, had used, or stolen, his Seconals, and he needed a new prescription. Dr. Carroll then prescribed 100 Seconals for Fischner, and told McNamara he should not use Fischner's Seconals, *and that if he needed them, because of his own troubles of sleeplessness, he would prescribe for him.*

McNamara gave the Doctor a lot of talk indicating that he was an important man; that he was a partner in a trucking firm, and that he was going to Florida in the next few weeks. McNamara and Fischner then walked around the Doctor's office and talked to him about the pictures of his children on the wall. They told him what a nice family he had. On cross-examination, they testified that they were not interested in the children whatever. Although they were together, Fischner testified that, in his presence, McNamara did not mention any of his own medical symptoms to the Doctor. This was false, as McNamara testified that, at that time, the Doctor asked him if he was having any medical problems, and McNamara said he was and that he was very tense with his job and had slight problems sleeping. Dr. Carroll then prescribed 100 Seconals for McNamara. Although McNamara then asked the Doctor for larger quantities, the Doctor said he would issue only 100

at a time. Dr. Carroll testified that when McNamara wanted pills for his truck drivers, "they got me all sweetened up with this fancy talk" and, as later appears, told Dr. Carroll he would certainly appreciate it if he could arrange sleeping pills for them as they needed their sleep and, with the pills, could get this sleep. They told Dr. Carroll that the truck drivers lived in a little place where the doctor had left the town, and they were not able to come up to Sandusky to Dr. Carroll's office, and that if he could help them, they would certainly appreciate it. McNamara then told Dr. Carroll that he was going to Florida for two or three weeks, and would like a similar prescription to cover that period. Dr. Carroll gave him another prescription post-dated, and McNamara paid the Doctor $30.00 for the prescription to Fischner, and for the two to himself, which was the equivalent of $10.00 each for three office calls.

On October 18, McNamara, accompanied by a man named Cole, called at Dr. Carroll's office. At that time, McNamara told the Doctor that he had sold the tablets to drivers in his trucking firm because they used pep pills to keep awake during the day and couldn't sleep at night without sleeping pills. Dr. Carroll declared that McNamara never mentioned that they had sold the Seconals. "He never said anything about it. If he was selling them, he never would have gotten any off of me. McNamara lied if he said he sold the Seconals to other persons." McNamara was so accustomed to lying and unsuccessfully trying to previously entrap Dr. Carroll that it seems impossible to believe he would risk telling him that he had been selling Seconals to his truck drivers. He asked for another prescription for himself to take the place of the prior prescription which Dr. Carroll had issued to him, and gave the names of the truck drivers, above mentioned, as Charles Banks, with a fictitious address in Utica; Ronald Tomcek, with an Utica address, and his age, and Kenneth Francen, with an Utica address and his age. All of these men were known to McNamara. Dr. Carroll, under the eye of McNamara, then wrote out complete patient records, for government information, for the three men before he issued the prescriptions, and then issued one prescription for Banks for 100 Seconals; two prescriptions for Tomcek, and two prescriptions for Francen, the latter two for 100 capsules each, and post-dating them by approximately a week. McNamara then left $50.00 on Dr. Carroll's desk for the prescriptions for the three truck drivers. So the last six counts of the indictment on which Dr. Carroll was convicted were for these six prescriptions—five for the truck drivers and one for McNamara. These were the only prescriptions Dr. Carroll issued on October 18. Dr. Carroll thought all the undercover agents were regular fellows, and he wanted to do something to help them in their misery from insomnia. When asked why he gave these prescriptions to these fellows, Dr. Carroll replied: "I thought their arguments were legitimate and I fell for what they said. They said: 'Don't date them all the same day. You will help us a heck of lot doing it that way.' Now, I could have marked on here to fill it four times [under the existing laws] and I wouldn't be in this doggone mess. Q. You had a right to do it? A. I had a right but the law has changed since then. Q. You had a right to give refillable prescriptions? A. That's true. Q. So they would not have to come back? A. That's true."

Cole then told Dr. Carroll that he needed Seconal or Tuinol because of sleeplessness, and that his doctor in Cleveland had prescribed 75 capsules a week for him. The Doctor asked him if he was a "doper" (drug user) and he replied he used them only to sleep. When the Doctor concluded to write a prescription for Cole, he asked him where he lived and Cole replied that he was living over a store in downtown Sandusky, but that he did not remember the street and address, other than the fact that it was running off the boulevard. The Doctor and Cole could not

reach an understanding on where the address was, and Cole suggested "that, perhaps I could give the address of a motel in town." The Doctor then told him he would place the address of the Holiday Inn on the prescription for an address, and "cautioned me as to where I had the prescription filled, and inquired whether I had $10.00." As Cole was leaving, the Doctor told him to have a better address than the motel *the next time he came back.*

Dr. Carroll then told Cole that in Sandusky if a stranger got caught with dope, the police would throw away the key, and to be careful about pharmacies as they considered more than two Seconals or Tuinols a day to be excessive. It is probably true that in most towns, if a person is arrested for some cause, and is found to be carrying 60 or 100 capsules of Seconal in his pocket, he is immediately suspected of being a "doper."

About a week later Dr. Carroll was indicted for unlawfully dispensing a controlled substance on October 16, 1973, to Cole. Dr. Carroll's defense was not guilty. The jury found Dr. Carroll not guilty of unlawfully dispensing the controlled substances to anyone on October 16, 1973. In finding Dr. Carroll not guilty, the jury found Cole guilty of entrapment, for Cole admitted he was trying to entrap the Doctor. This case presents numerous difficulties. The information contains ten counts.

The first four counts set forth in the same language:

"On or about October 16, 1973, in the Northern District of Ohio, Western Division at Sandusky, Ohio, John L. Carroll, M.D., did knowingly, or intentionally, unlawfully dispense or cause to be distributed a controlled substance, to wit: seconal 100 mg. in violation of Title 21, United States Code, Section 841(a)(1)."

The remaining six counts set forth, in the same language:

"On or about October 18, 1973, in the Northern District of Ohio, Western Division, at Sandusky, Ohio, John L. Carroll, M.D., did knowingly, or intentionally, unlawfully dispense or cause to be distributed a controlled substance, to wit: seconal 100 mg., in violation of Title 21, United States Code, Section 841(a)(1)."

The only difference in the ten counts is that in the first four, the date of the dispensation is October 16, 1973, and, in the next six counts, the date of dispensation is October 18, 1973.

THE EVIDENCE DISCLOSES THAT ON EVERY OCCASION IN THIS CASE WHEN DR. CARROLL WROTE A PRESCRIPTION FOR SLEEPING PILLS HE DID IT ON THE REPRESENTATIONS OF THESE UNDERCOVER MEN, THAT THEY WERE SUFFERING FROM INSOMNIA: AND HIS ONLY OBJECTIVE WAS THAT OF A MEDICAL DOCTOR WHO WAS ACTING FROM HUMANITARIAN MOTIVES IN KEEPING THEM FROM THEIR SUFFERING FROM THIS NERVOUS AND DISABLING MALADY AND DISTRESS, THAT IS SO COMMON IN THE UNITED STATES.

We proceed then to a resume of the prescriptions given to undercover agent, McNamara, on October 18, 1973. On this occasion McNamara was accompanied by undercover agent Cole. Cole, as above stated, was afterwards found guilty of entrapping Dr. Carroll into prescribing Seconal for him on October 16, 1973. The jury found that Dr. Carroll was not guilty of furnishing Seconal to McNamara on October 16, 1973, although McNamara was at that time, according to his own admission, trying to entrap Dr. Carroll into prescribing Seconal to him on that date.

The jury found that Dr. Carroll had not been guilty of violation of the Act in prescribing Seconal for Fischner on October 16, although Fischner had been trying to entrap Dr. Carroll on that date.

The Special Agent of the Department of Justice gave it as his opinion that Dr. Carroll was issuing prescriptions to make money.

Cole was asked:

"Q. Well, if he were doing it to make money, why would he give you a prescription for only a week's supply, and then tell you to come back?

A. Well, I did complain.

Q. What complaint did you make?

A. I complained because the prescription was only for 60.

Q. And you wanted more?

A. I wanted 75.

Q. And so he gave them to you?

A. He gave me a prescription for 60, yes, sir.

Q. And he charged you $10?

A. Yes, sir.

Q. And he told you that was a month's supply?

A. No, sir, he did not."

Dr. Carroll said that as Cole was a young man and even though he insisted, it was not in his best interest to be given more pills.

For all the calls, the talks, the making out of the patient cards, the explanations and the writing out of the prescriptions, Dr. Carroll received the munificent sum of $50.00. After securing the five prescriptions for the truck drivers, Dr. Carroll asked no regular $10 call fee and McNamara was charged nothing for these prescriptions; but when Dr. Carroll gave McNamara these prescriptions, McNamara threw fifty dollars on Dr. Carroll's desk and said: "This is for helping us out and being such a nice guy; here is $50," "and away they went." Dr. Carroll was then asked if this money thrown on his desk didn't make him wonder about it, and suspect something. Dr. Carroll was asked:

"Q. Did you suspect anything went on?

A. Well, I began to think afterwards that I was set up, which I was.

Q. Would you have sold these people these prescriptions if they had not told you that they needed them for sleeping?

A. No, definitely not.

Q. You didn't hand these out in the knowledge that they might resell them?

A. Oh, no, definitely not."

The claim of the undercover agents that they told Dr. Carroll they were getting the pills and reselling them is, from the above colloquy, proved absolutely false for the reason that all of the undercover agents previously testified alike—that they told Dr. Carroll they needed sleeping pills for their own sleeplessness. This is a rare instance when an undercover agent is proved to be a perjurer by his own contradictory subsequent claims and statements before the court in which he was testifying. Dr. Carroll's remark to government counsel, who was implying that he was in the business of writing prescriptions for sleeping pills for the purpose of making money, seems pertinent and devastating. His answer to the question of how much he got for all the prescriptions he wrote in this case was: "A hundred dollars. What the hell is a hundred dollars?" It will be remembered that $50.00 of this hundred dollars was for prescriptions for the truck drivers, for whom Dr. Carroll, admittedly, made no charge; but as McNamara was leaving the office for good, he threw $50.00 on the doctor's desk to attempt to strengthen the government's case, saying: "This is for helping us out and being such a nice guy" and then rushing through the door, never to return.

With regard to making money, Dr. Carroll had answered the government counsel: "No, I'm not worried about money, or I wouldn't do all these things I'm doing, this charity stuff. People come in now, and sometimes they are charged 70, 75, 80, or 85 dollars for a first examination. They do everything. They come to me and I get $10." Obviously, the patients in these times are too poor to pay the Doctor's regular charges. "How am I going to get rich? Ten dol-

lars a throw. I don't see that many people any more."

When government counsel alluded to the fact that Dr. Carroll had put his six children through college, three through graduate schools, and he was nearing retirement, and that he didn't suppose Dr. Carroll had been able to put very much away, Dr. Carroll replied: "I have a little bit put away if the stock market comes back." He also owned a building.

Dr. Carroll was nearing retirement and the cause was the following: Within a week of the last of these prescriptions written for the undercover agents, Dr. Carroll was suddenly stricken by a very dangerous vascular attack, which consisted of the *plugging of the carotid artery* which arises from the arch of the aorta and which supplies blood to the brain— producing the effect of a stroke. Immediate surgery was necessary to save Dr. Carroll's life and, as he stated, or as the court stenographer understood it, an "arterectomy" was performed. The proper spelling of the quoted term is "arteriotomy." [1] "Arterio-" is a combined form, Greek, arterio, - arteri, from arteria, artery, denoting also arterial, and, as in arteriology, the branch of science which deals with arteries." [2]

In "Extracranial Occlusive Cerebrovascular Disease," by Wylie and Ehrenfeld, W. B. Saunders Company, Philadelphia, 1970, it is stated on page 62:

"Chronic and persistent, but subtle, signs of visual and cerebral dysfunction [3] (impaired functioning as of an organ of the body) are often obscured in patients with the more dramatic monocular (having one eye [4] and cerebral TIA's.[5] The reversible nature of these chronic signs may only be recognized *in retrospect* following surgical improvement of blood flow to the involved hemisphere [6] (cerebral hemisphere. See Brain). One of these signs is decreased mentation; [7] (mental process or function); *the patient's spouse or a member of the family frequently is the first to point out the improvement in the patient's memory and comprehension following surgical*

treatment of the obstructive carotid disease. Our most striking encounter with this phenomenon involved a physician, a radiologist, who had bilateral carotid ulceration and stenoses, causing transient monocular blackouts of vision and transient attacks of monoparesis. In the year before his bilateral *carotid* endarterectomies, *he had become aware of his progressive inability to interpret radiological findings, [and] his failing memory * * *. Two weeks after carotid surgery, these temporal and parietal functions were again normal. Most of our patients who have had striking improvement in mentation after surgery had bilateral carotid lesions."* (Emphasis supplied.)

The foregoing references (1) (2) (3) (4) (6) (7) are as defined in Webster's New International Dictionary; and reference (5) is from "Extracranial Occlusive Cerebrovascular Disease," by Wylie and Ehrenfeld, cited *supra,* and means: "Transient ischemic attacks" p. 231. "Ischemic" means "Deficiency of the blood in a part; local anemia." Webster's New International Dictionary.

This is a much stronger case than that of Dr. Patty, in *Patty* v. *Board of Medical Examiners,* 9 Cal.3d 356, 107 Cal. Rptr. 473, 508 P.2d 1121, discussed, *post,* on pages 208–209 on the subject of the state of mind and memory of a doctor who was accused of violating the law in illegally issuing prescriptions for controlled substances, and was found not guilty in spite of attempted entrapment by agents of the law.

*The cerebral attack which Dr. Carroll suffered directly indicated, from the above references to medical authorities, that his memory and his ability to handle and interpret professional medical problems had deteriorated (decreased mentation) at least six days before the surgical operation; and miraculously a member of his family could recognize shortly after surgery the improvement in his mental processes and functions, and that these functions were again normal.* The reasonable conclusion, considering this dangerous brain affliction producing the effect of a stroke, was that *Dr. Carroll was not acting normally* when he

signed the prescriptions for the truck drivers without the prescriptions being dated, because McNamara had asked him not to date them. However, a hypothetical question would probably be the means of absolute proof of the foregoing conclusion. Immediately thereafter he testified: "Well, I began to think afterwards that I was set up which I was. * * * Well, sure it is postdated. They set me up and made a foolish stooge out of me * * *. They conned me into putting different dates on them which I did, being stupid." As to further questions about the dates, Dr. Carroll again testified: "I was stupid and they conned me into it." All this shows Dr. Carroll was not acting normally, post page 208, when he yielded to McNamara in his begging him not to put the dates on the prescriptions because he could under the law at that time, have given them prescriptions to be refilled five times without further action on his part and, in any prescription, he could have determined in his professional capacity how many pills each needed for his mild or chronic insomnia.

Dr. Carroll was an ill man, 70 years old, and over-worked. It was only six days after writing the last six prescriptions that he suffered the dangerous cerebral attack, which required extensive brain surgery. Such illness may be recognized only in retrospect following surgery. (Ante, pages 196 and 197) A hypothetical question would have accomplished the work of proving the foregoing.

It was four months later, in February 1974, that he was able to return to work at his profession. So when, on the trial on April 22, 1974, the government counsel attempted to show that Dr. Carroll was hard up and was approaching retirement and needed money, the fact was that the real reason for his approaching retirement was the dangerous heart attack, surgery and convalescence until February 1974. It was only two months after Dr. Carroll was able to get out of bed following his recovery that, on April 22, 1974, the government attorney was

suggesting that Dr. Carroll was prescribing sleeping pills because his business wasn't what it used to be and that he was approaching retirement and wanted to amass any amount of money.

The government undercover agents and government counsel seemed to pretend to be ignorant of the fact that insomnia is a common affliction that causes great subjective distress leading to a large consumption of sedatives in the United States, according to medical authorities, and that the only remedy to alleviate this distressing affliction, known personally by practically everybody, is sedatives, as stated in books written by the medical profession. However, all of the foregoing is unnecessary to prove, because Dr. Carroll was entrapped by the deceit and repeated, persistent and incessant solicitation of the officers that these prescriptions were necessary to prevent the distress of insomnia.

We revert then to the essential facts and the law of the case.

"To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." A more felicitous statement of the problem we envisage could not be expressed better than the above quotation from Chief Justice Warren's opinion in *Sherman* v. *United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848.

In *Sorrells* v. *United States,* 287 U.S. 441, 53 S.Ct. 212, Chief Justice Hughes, speaking for the Court, said:

"It is clear that the evidence was sufficient to warrant a finding that the act for which defendant was prosecuted was instigated by the prohibition agent, that it was the creature of his purpose, that defendant had no previous disposition to commit it but was an industrious, law-abiding citizen, and that the agent lured defendant, otherwise innocent, to its commission by repeated and persistent solicitation in which he succeeded by taking advantage of the sentiment aroused by remi-

niscences of their experiences as companions in arms in the World War. Such a gross abuse of authority given for the purpose of detecting and punishing crime, and not for the making of criminals, deserves the severest condemnation; but the question whether it precludes prosecution or affords a ground of defense and, if so, upon what theory, has given rise to conflicting opinions.

"It is well settled that the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and strategem may be employed to catch those engaged in criminal enterprises. * * * The appropriate object of this permitted activity, frequently essential for the enforcement of the law, is to reveal the criminal design; to expose the illicit traffic, the prohibited publication, the fraudulent use of the mails, the illegal conspiracy, or other offenses, and thus to disclose the would-be violators of the law. *A different question is presented when the criminal design originates with the officials of the Government, and they implant in the mind of the innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute.* * * *

* * * * * *

"While this Court has not spoken on the precise question ( * * * ), the weight of authority in the lower federal courts is decidedly in favor of the view that in such a case as the one before us the defense of entrapment is available." (Emphasis supplied.)

As stated in *United States* v. *Russell,* 411 U.S. 429, 93 S.Ct. 1641, the *thrust of the entrapment defense in Sorrells* v. *United States, supra, was held by Chief Justice Hughes, "to focus on the intent or predisposition of the defendant to commit the crime."* (Emphasis supplied.)

The problem presented by entrapment has had a wealth of consideration by the courts, first emphasized profoundly and comprehensibly in the classic case of *Sorrells* v. *United States,* 287 U.S. 438, 53 S.Ct. 210 (1932), by the views of Mr. Chief Justice Hughes, speaking for the 5 to 4 majority, and by Mr. Justice Roberts, speaking for the minority. Each opinion emphasizes the predominant differing views as to the major element of entrapment. These views can be summarized as follows: The difference in the views of the majority and concurring opinion is that in the former the inquiry focuses on the predisposition of the defendant, whereas in the latter the inquiry focuses on whether a government official instigated the crime. The views of Mr. Chief Justice Hughes have been heretofore set forth at length.

In Mr. Justice Roberts' opinion, he declared:

"Of late the term 'entrapment' has been adopted by the courts to signify instigation of crime by officers of government. The cases in which such incitement has been recognized as a defense have grown to an amazing total. The increasing frequency of the assertion that the defendant was entrapped is doubtless due to the creation by statute of many new crimes, (e. g., sale and transportation of liquor and narcotics) and the correlative establishment of special enforcement bodies for the detection and punishment of offenders. The efforts of members of these forces to obtain arrests and convictions have too often been marked by reprehensible methods.

* * * * * *

"Entrapment is the conception and planning of an offense by an officer, and his procurement of its commission by one who would not have perpetrated it except for the trickery, persuasion, or fraud of the officer. * * * The reasons assigned in support of this procedure have not been uniform. Thus it has been held that the acts of its officers estop the government to prove the offense. * * * Often the

defense has been permitted upon grounds of public policy, which the courts formulate by saying *they will not permit their process to be used in aid of a scheme for the actual creation of a crime by those whose duty is to deter its commission.*

\* \* \* \* \* \*

"There is common agreement that where a law officer envisages a crime, plans it, and activates its commission by one not theretofore intending its perpetration, for the sole purpose of obtaining a victim through indictment, conviction and sentence, the consummation of so *revolting a plan* ought not to be permitted by any self-respecting tribunal. \* \* \* Public policy forbids such sacrifice of decency.

\* \* \* \* \* \*

"The applicable principle is that courts must be closed to the trial of a crime instigated by the government's own agents. No other issue, no comparison of equities as between the guilty official and the guilty defendant, has any place in the enforcement of this overruling principle of public policy." *Sorrells* v. *United States, supra,* pp. 453, 454, 459, 53 S.Ct. pp. 217, 219.

In *United States* v. *Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366, the latest case on the subject, the same issue of entrapment came before the court, and *Sorrells* v. *United States, supra,* was reaffirmed in another 5 to 4 opinion, in which Mr. Justice Rehnquist wrote the judgment of the court, referring to *Sorrells* v. *United States, supra* and *Sherman* v. *United States, supra,* and declaring:

"This Court first recognized and applied the entrapment defense in *Sorrells* v. *United States,* 287 U.S. 435 [53 S.Ct. 210, 77 L.Ed. 413] (1932). In *Sorrells,* a federal prohibition agent visited the defendant while posing as a tourist and engaged him in conversation about their common war experiences. After gaining the defendant's confidence, the agent asked for some liquor, was twice refused, but upon asking a third time the defendant finally capitulated, and was subsequently prosecuted for violating the National Prohibition Act.

"Mr. Chief Justice Hughes, speaking for the Court, held that as a matter of statutory construction the defense of entrapment should have been available to the defendant. Under the theory propounded by the Chief Justice, the entrapment defense prohibits law enforcement officers from instigating a criminal act by persons 'otherwise innocent in order to lure them to its commission and to punish them.' 287 U.S. at 448 [53 S.Ct. at 215]. Thus, the thrust of the entrapment defense was held to focus on the intent or predisposition of the defendant to commit the crime. '[I]f the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue.' Id., at 451 [53 S.Ct. at 216].

"Mr. Justice Roberts concurred but was of the view 'that courts must be closed to the trial of a crime instigated by the government's own agents.' Id., at 459 [53 S.Ct. at 219]. The difference in the view of the majority and the concurring opinions is that in the former the inquiry focuses on the predisposition of the defendant, whereas in the latter the inquiry focuses on whether the government 'instigated the crime.' "

Where is there any evidence in this case of Dr. Carroll's intent or predisposition to commit the crime charged against him, or any crime? There is no evidence whatever to this effect. Did the criminal design originate with Dr. Carroll? There is no evidence whatever that a criminal design originated with Dr. Carroll. The evidence is undisputed that the criminal design originated with the officials of the Government. Was Dr. Carroll an innocent man at the time the first government officials ap-

proached him for Seconal? There is no evidence or suspicion that Dr. Carroll had ever committed a crime at the time when the undercover agents first met him. Who implanted in his mind the criminal design of violating the law by the illegal prescription of drugs? It is undisputed that Dr. Carroll was an honorable man who had practiced medicine in the same town for forty-three years, and that no one ever had any suspicion of improper medical conduct against him. Out of his individual practice he had educated six children through college, and several of them through their graduate work. Now, at the age of seventy, his medical practice is practically all charity work as a result of dangerous surgery and a long period of four months' convalescence.

The use of decoys is not permissible to ensnare an innocent and law-abiding man into the commission of a crime. Webster's New International Dictionary defines "decoy" as follows: "Anything intended to lead into a snare; a lure; a bait; * * * a person employed by officers of justice, * * * to *induce a suspected person to commit an offense under circumstances that will lead to his detection.*" (Emphasis supplied.)

In *Newman* v. *United States,* 299 F. 128, 131, (C.C.A. 4) 1924, Judge Woods, speaking for the court, said:

"As the issue of entrapment was vital, the defendant was entitled to an accurate statement of the law of entrapment. It is well settled that decoys may be used to entrap criminals, and to present opportunity to one intending or willing to commit crime. *But decoys are not permissible to ensnare the innocent and the law-abiding into the commission of crime. When the criminal design originates, not with the accused, but is conceived in the mind of the government officers, and the accused is by persuasion, deceitful representation, or inducement lured into the commission of a criminal act, the government is estopped by sound public policy from prosecution therefor.* 'The first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it.' "

In reversing a conviction for violation of the Federal Narcotics Laws, Judge Duffy, speaking for the court in *United States* v. *Lemons,* 200 F.2d 396, 397, said:

"This court discussed in some detail the law of entrapment in United States v. Perkins, 1951, 190 F.2d 49, where the defendant was likewise accused of violating Federal Narcotic Laws. We pointed out that it was difficult to state an all-embracing definition of entrapment, but that it was well established that decoys may be used to present opportunity to one intending and willing to commit crime, *but that the use of decoys is not permissible to ensnare the innocent and law-abiding into the commission of crime.* We also pointed out that when the criminal design originates, not with the accused, but in the mind of government officers, and the accused is lured by persuasion, deceitful representation or inducement into the commission of a criminal act, then the government is estopped by sound public policy from prosecuting the one who commits it." (Emphasis supplied.)

In *Hughes* v. *United States,* 427 F.2d 66, 69 (C.A. 9), in reversing a conviction in a narcotics case, where the determinative issue was with respect to entrapment, Judge Burke said:

"Since the ultimate issue is appellant's claimed seduction and inducement to commit the offense, *evidence of his predisposition, state of mind and criminal design is of great probative value and must be subjected to the most searching type of inquiry.* See Sorrells v. United States, 287 U.S. 435, 451, 53 S.Ct. 210, 77 L.Ed. 413 (1932). *Only through such evidence can the jury fairly determine whether the government agent or informer has 'play[ed]' on the weaknesses of an innocent party and beguile[d] him into committing crimes which he otherwise*

*would not have attempted.'* Sherman v. United States, 356 U.S. 369, 376, 78 S.Ct. 819, 822, 2 L.Ed.2d 848 (1958)." (Emphasis supplied.)

*There was none of the necessary and "most searching type of inquiry" as to any evidence of Dr. Carroll's predisposition, state of mind and criminal design which "is of great probative value." Neither the prosecution nor the court ever attempted to subject Dr. Carroll to this searching type of inquiry. Plainly, it would have, from the evidence in this case, completely exonerated Dr. Carroll and caused the jury to "fairly determine whether the government agent or informer has 'play[ed] on the weaknesses of an innocent party and beguile[d] him into committing crimes which he otherwise would not have attempted.'"* Sherman v. *United States,* 356 U.S. 369, 376, 78 S.Ct. 819, 822, 2 L.Ed.2d 848 (1958). (Emphasis supplied.)

In 98 C.J.S. Witnesses § 553 p. 494, it is stated:

"One who as a spy or investigator obtains information is not necessarily open to discredit thereby, but witnesses who have been hired by the party for whom they testify to procure evidence or work up the case are interested and their credibility is affected thereby. *Likewise, in a criminal prosecution the testimony of detectives, police officers, and spies or informers should be considered in the light of their interest in the outcome of the prosecution."* (Emphasis supplied.)

In *Notaro* v. *United States,* 363 F.2d 169, 174 (C.A. 9), Judge Ely, in reversing a conviction for violation of a drug act, said that "it seems quite clear that when it can be said that the issue of entrapment has fairly arisen, whether by testimony given during the presentation of the prosecution's case in chief or by testimony offered in defense, *the defendant has met whatever 'burden' rests upon him."* (Emphasis supplied.)

In *Dupuy* v. *State,* Fla.App., 141 So.2d 825, Godoy, a paid investigator for the Board of Dental Examiners, who was making a spot check of the laboratories to determine whether any laws were being violated, came to Dupuy who was in charge of a laboratory, and Godoy asked him to make a partial plate for him, which Dupuy did. Dupuy was a licensed dental technician, practicing his profession in Dade County, Florida. He was not licensed to practice dentistry and was, therefore, violating the law in making the partial plate for the paid investigator. A week or two later, the investigator returned with Mrs. Shadron, another paid investigator, and after some negotiation, defendant relined her dental plate, which he was not authorized to do as he was not licensed to practice dentistry. On the basis of these transactions, an information was filed against Dupuy.

Dupuy contended that the record indicates he should have been found not guilty by reason of entrapment. The court upheld the contention that Dupuy had been entrapped. In its decision, the court said:

"When government inducement is employed to entrap someone not engaged in such a course of criminal activity, it has not detected crime but has merely acted to create it. Hence the rule is that the defense of entrapment is available to those who are instigated, induced, or lured by an officer of the law * * * to commit a crime which they had otherwise no intention of committing * * *."

Although Dr. Carroll was found not guilty of the first four counts of prescribing Seconal, he was, incongruously, found guilty of the last six counts. The same government agents were the decoys and, by the jury, were found guilty of attempting to entrap Dr. Carroll on the first four counts. The same four government agents were the decoys who were trying to entrap Dr. Carroll on the last six counts.

In *United States* v. *Klosterman,* 248 F.2d 191, 195, the court said:

"While it is true that under normal circumstances entrapment is usually a jury question, where the evidence points to only one conclusion the ques-

tion may be decided as a matter of law, just as any other factual issue admitting of only one conclusion." Citing *Morei* v. *United States,* 127 F.2d 827, 835 (C.A.6).

The evidence clearly shows that under the law Dr. Carroll was entitled to a directed verdict of not guilty on all counts.

In *Morei* v. *United States,* 127 F.2d 827, 833, 834, 835 (C.A.6), the leading case on entrapment from this court, appellant Morei's conviction for violating the narcotics law was reversed on the ground that he had been the victim of entrapment. An undercover agent was discussing with a doctor in Newark, Ohio, where he could get heroin to administer to race horses. The doctor said he had no heroin, but mentioned the name of Morei in Cleveland as a person who might have some of the drug. The undercover agent learned that Morei "would do anything in the world for Dr. Platt." The informer found that Morei did a little business on a street corner of Cleveland where his business included servicing of gum machines, sale of washing machines, refrigerators, batteries, as well as selling odd lots of remnants and slightly damaged apparel. He had a small room with a desk and telephone nearby. Morei was pointed out to the undercover agent, who told him he had a proposition to make a lot of money betting on horses that had been given heroin to stimulate them. He told Morei that he wanted some heroin to "fix" horses, and that Dr. Platt had told him to give Morei the names of the horses, so that Morei could get a bet on them. The undercover agent told Morei to "bear in mind you are going to make big money if you stand by me." Morei had no heroin, so the agent gave him $110 to make a purchase. In some way Morei found where he could get the heroin for the price, and after receiving it from an unknown man on a dark street, gave it to the agent, whereupon he was arrested for purchasing and selling narcotics. Morei had a good reputation, and had never been engaged in narcotics or any criminal enterprise and there was no reasonable cause to believe he had ever been engaged in the narcotic traffic or any other criminal transaction. The court held that the agent had made such strong inducements to secure the heroin that he was guilty of entrapping him. The conviction of Morei was reversed.

In the course of its opinion, the court said:

"Entrapment is seduction or improper inducement by law enforcement officers to commit a crime. *United States* v. *Wray,* 8 F.2d 429 (C.C.A.D. C.). The gist of the entrapment is that the agent manufactured the offense and then incited the accused to commit it for the purpose of prosecution. *Swallum* v. *United States,* 39 F.2d 390 (C.C.A.8). In *United States* v. *Certain Quantities of Intoxicating Liquors,* 1 Cir., 290 F. 824, 826, the court said that in this class of case, in order to warrant a conviction, there must be present: '(1) Reasonable suspicion on the part of the officers that the party is engaged in the commission of a crime or is about to do so; or (2) The original suggestion or initiative must have come from the perpetrator.' In *Butts* v. *United States,* 273 F. 35, 38, (C.C.A.8) it was said: 'When the accused has never committed such an offense as that charged against him prior to the time when he is charged with the offense prosecuted, and never conceived any intention of committing the offense prosecuted, * * * the fact that the officers of the government incited and by persuasion and representation lured him to commit the offense charged, in order to entrap, arrest, and prosecute him therefor, is and ought to be fatal to the prosecution, and to entitle the accused to a verdict of not guilty.' In United States v. Echols, D.C., 5 Cir., 253 F. 862, the court said:

"'It is clearly the law that, while it may be true that the mere aiding of one in the commission of a criminal act by a government officer, or agent, does not preclude the convic-

tion of the party committing the crime, yet, where the officers of the law have incited or induced the commitment of the crime, and lured the defendant on to its commission, the law will not authorize a verdict of guilty. * * * This rule does not proceed from or rest on any limitation of the right of the officers of the law to obtain evidence of crime in any manner possible, nor is it a defense to a prosecution that the officer participated in the commission of a crime, if the genesis of the idea, or the real origin of the criminal act, sprang from the defendant, and not from the officer * * * *But this statement in no manner authorizes government officers, employed to prevent crime and apprehend criminals, to thus conceive and set on foot the commission of an offense merely in order to make an arrest.'* " (Emphasis supplied.)

The court then stated:

"Under the circumstances disclosed by the record, Morei's motion to direct a verdict of not guilty, should have been granted. His conviction is reversed."

In *Morales* v. *United States*, 260 F.2d 939 (C.A. 6), the court held that where there was no proof that defendant had any contact with persons engaged in illicit sales of narcotics nor any evidence whatsoever of circumstances that would justify even a reasonable suspicion that he was engaged in the traffic, and defendant was not an addict, had no criminal record, obtained and transferred marijuana only after being repeatedly requested to do so by an informer ten or fifteen times to get it from a certain person so that he could make money out of it, and finally succumbed to the repeated pressure of the undercover agent, the court held that, under these circumstances, there was "entrapment" and defendant could not be convicted of transferring the marijuana in violation of the law, citing *Morei* v. *United States*, 127 F.2d 827 (C.C.A. 6). "While it is true that under normal circumstances entrapment is usually a jury question, where

the evidence points to only one conclusion the question may be decided as a matter of law, just as any other factual issue admitting of only one conclusion." *United States* v. *Klosterman*, 248 F.2d 191, 195 (C.A.3).

In *Wall* v. *United States*, 65 F.2d 993 (C.C.A.5), Isabel Knowles, who was paid for her services by the Government, had some years previously been the mistress of the appellant. · Helbrandt, a government narcotic agent, went with Knowles to Tampa, Florida, where appellant was living, and as soon as she arrived there, under the agent's direction, began calling appellant by telephone in various places and, finally succeeding, induced him to call at her room in the hotel the next day, where she introduced Helbrandt to him as her husband. Knowles told appellant she was suffering with cramps and pains in her stomach for want of narcotics, and insisted that he help her get some. Appellant was afraid she would make a scene because of her suffering and being unable to get narcotics. Believing her to be actually suffering and needing relief, he gave her a note to one Zarata, and with this introduction the informer, Knowles, and the narcotic agent obtained three ounces of morphine through Zarata. When appellant gave them the name of Zarata, he thought that the latter "might put her in touch with some Latin doctor in Ybor City" who would supply her morphine for her pain. Knowles was not suffering pain in her stomach because of want of morphine. She and the undercover agent attempted to show that appellant wanted morphine for resale, an unlikely story, as appellant was undisputed in his statement that he had never sold narcotics. The court held that if the government narcotic agent and the woman, Knowles, "took advantage of the sympathy appellant would naturally have for Isabel Knowles because of their former illicit intimate relations and thereby induced appellant to put the agents in touch with Zarata to pander to her craving for morphine, and he was acting solely in the belief that by so doing he

would alleviate her suffering, and he was not in any other way interested in the unlawful sale, this would amount to entrapment, and the conviction could not be sustained," and that "it was error to refuse to charge on the question of entrapment."

In *Patty* v. *Board of Medical Examiners,* 9 Cal.3d 356, 107 Cal.Rptr. 473, 508 P.2d 1121, 1131, defendant doctor, Patty, 59 years of age, was the first black graduate of his medical school. Prior to the acts charged against him, no disciplinary action of any kind for unprofessional conduct had ever been brought against him. His professional activities over this lengthy career had been in all respects exemplary. He was on the staff of the Hollywood Community Hospital, Community Hospital of Los Angeles, and Los Angeles County Hospital. Under these circumstances, undercover Suazo called on Patricia Wolf and her roommates, who were Suazo's parttime undercover agents. He instructed one of the young women that her job "consisted mainly of working doctors, and going to doctors' offices for various reasons, one being to obtain prescriptions for narcotics or dangerous drugs." In late 1967, *Dr. Patty became ill* but continued to work and see patients. On January 4, 1968, Wolf visited the doctor's office as a patient for medication. When asked what was wrong with her, Wolf replied "nothing" but that she needed a prescription for "Whites" or "doxies." The doctor did not know what she was talking about and was unable to write a prescription until he called the pharmacy, and then issued a prescription for 100 tablets of amphetamine sulfate.

Dr. Patty suffered an acute myocardial infarction three days later but, contrary to his doctor's orders, continued to see patients. Wolf came in again with a second undercover investigator on January 10, 1968, and obtained prescriptions for amphetamine sulfate and empirin. Dr. Patty received $10 for each visit, his standard charge.

On March 29, 1968, two of the undercover agents introduced the principal agent, Suazo, who requested amphetamines and "Perc," a percodan narcotic. Dr. Patty refused to prescribe the narcotic but did write a prescription for amphetamine sulfate and empirin. Dr. Patty thus gave prescriptions to four different persons, each of whom was an undercover agent introduced by the girl, Wolf.

The court found that Dr. Patty did not have a preconceived interest to issue prescriptions for dangerous drugs, but had been lured and induced into that unprofessional conduct "by the persuasive powers of young women who were *employed to ensnare him at a time when his judgment was seriously impaired, possibly because he was ill,"* as above stated.

In passing upon the case, the court said:

"Applying the 'origin of intent' test of entrapment, the court found that Dr. Patty did not have a preconceived intent to issue prescriptions for dangerous drugs, but had been lured and induced into that unprofessional conduct by the persuasive powers of young women who were employed to ensnare him *when his judgment was seriously impaired, possibly because he was ill."* (Emphasis supplied.)

Wolf, the first undercover agent lined up by Suazo to induce the doctor to prescribe for her, was "an actress, model and hostess" the type of decoy that every government official would want to have as an undercover agent to lure a doctor into prescribing for her.

"The court found a preconceived plan of entrapment, stating 'Petitioner was entrapped by Wolf on January 4, 1968, into the unlawful act * * * and Wolf's conduct in so entrapping Petitioner was the commencement of a preconceived plan in which Krieger, Dalton and Suazo also participated.'" The court added:

"On grounds of repugnancy to good morals, it is entrapment to lure a person into the commission of a crime he did not himself intend to commit, and

this is especially so where the one who induces the commission of the offense is an officer of the law. Inasmuch as Petitioner's wrongdoing was not the result of a pre-existing intent on his part to engage in the unprofessional conduct, and inasmuch as the origin of the intent was in the mind of Suazo, an investigative officer for the State, Petitioner's defense of entrapment is available to him, not in the view that Petitioner as an accused party may go free, but that the government cannot be permitted to contend that he is guilty of a crime, where government officials are the instigators of Petitioner's conduct."

The court concluded:

"Society gains little by the government's inducement of a physician, who has avoided the pitfalls of illicit conduct for 20 years, into performing a criminal act. To exclude such a doctor from his profession is to remove from the community one who, but for the wrongful governmental conduct 'might well have obeyed the law.' (Sherman v. United States, 356 U.S. 369, 384 [78 S.Ct. 819, 2 L.Ed.2d 848] * * *) Outweighing this questionable 'gain' is the loss of an otherwise law-abiding and useful physician."

The judgment of not guilty by reason of entrapment was affirmed.

It can here be repeated that on every occasion in this case where Dr. Carroll wrote a prescription for sleeping pills, he did it on the representations of these undercover officers that they were suffering from insomnia; and his only objective was that of a medical doctor who was acting from humanitarian motives in keeping them from suffering from this nervous and disabling malady and distress that is so common in the United States.

The overwhelming weight of the evidence proves that in writing these prescriptions on false representations of insomnia, on the part of the undercover officers, Dr. Carroll was sought to be entrapped into possible violation of the law.

We come then to the contention of appellant that the court erred in charging the jury. Title 21, U.S.C.A., Section 841, insofar as here pertinent, provides as follows:

"(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or

(2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

(b) Except as otherwise provided in section 845 of this title, any person who violates subsection (2) of this section shall be sentenced as follows: "

The terms of imprisonment and fines are then set forth. Section 845 of Title 21 U.S.C.A. has no application to this case, as it pertains to "Distribution to persons under age twenty-one."

"(a) Except when dispensed directly by a practitioner, other than a pharmacist, to an ultimate user, no controlled substance in schedule II, which is a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act, may be dispensed without the written prescription of a practitioner, except that in emergency situations, as prescribed by the Secretary by regulation after consultation with the Attorney General, such drug may be dispensed upon oral prescription in accordance with section 353(b) of this title. Prescriptions shall be retained in conformity with the requirements of section 827 of this title. No prescription for a controlled substance in schedule II may be refilled.

Schedule III and IV substances

"(b) Except when dispensed directly by a practitioner, other than a pharmacist, to an ultimate user, no con-

trolled substance in schedule III or IV, which is a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act, may be dispensed without a written or oral prescription in conformity with section 353(b) of this title. Such prescriptions may not be filled or refilled more than six months after the date thereof or be refilled more than five times after the date of the prescription unless renewed by the practitioner.

### Schedule V substances

"(c) No controlled substance in schedule V which is a drug may be distributed or dispensed other than for a medical purpose."

In Title 21 U.S.C.A. Sec. 871, it is provided that the Attorney General may delegate any of his functions under this title to any officer or employee of the Department of Justice, and may promulgate and enforce any rules, regulations, and procedures which he may deem necessary and appropriate for the efficient execution of his functions under this title.

In the Drug Enforcement Administration of the Department of Justice, it is provided, insofar as here applicable, in 21 Code of Federal Regulations, Section 1306.04, as follows:

"§ 1306.04 Purpose of issue of prescription.

(a) A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

(b) A prescription may not be issued in order for an individual practitioner to obtain controlled substances for supplying the individual practitioner for the purpose of general dispensing to patients.

(c) A prescription may not be issued for the dispensing of narcotic drugs listed in any schedule to a narcotic drug dependent person for the purpose of continuing his dependence upon such drugs, in the course of conducting an authorized clinical investigation in the development of a narcotic addict rehabilitation program."

Dr. Carroll was a "practitioner" within the meaning of the statute. The contentions of the Government are that any prescription "of controlled substances" issued by him must be issued by an individual practitioner for a legitimate medical purpose acting in the usual course of his professional practice. This is conceded. It is claimed that the prescriptions issued by him in this case violated the law on the alleged ground that they were not issued for a legitimate medical purpose in the usual course of Dr. Carroll's professional practice, and that on four of the ten prescriptions issued by Dr. Carroll, for which he was indicted, the jury found him not guilty by reason of the entrapment of the government agents for whom he prescribed them. On the next six prescriptions he was found guilty of issuing them for an illegitimate purpose and, in doing so, was violating the law in acting outside the usual course of his professional practice. It is also claimed he was guilty of violation of the law because he issued prescriptions for five truck drivers who were not before him and whom he did not examine.

There are no provisions of the law that are, in the least, definite or serve as

guidelines as to the meaning of a legitimate medical purpose—or that can be agreed upon, nor are there any provisions of the law that serve as guidelines for "acting in the usual course of his professional practice."

Throughout the record are prejudicial questions and suggestions that Dr. Carroll violated the law because he did not submit the undercover agents to a medical examination before prescribing sleeping pills for their insomnia. After undercover agent Cole told him he needed pills for his sleeplessness, the government counsel asked Cole, and he answered as follows:

"Q. Other than asking your age, did Dr. Carroll ask you any question of a medical nature?

(Cole had already told Dr. Carroll that he needed Seconal to be used to get his sleep, and told Dr. Carroll that his doctor in Cleveland had been prescribing 75 Seconals at a time.) Cole's answer to the above question was:

A. No."

Resuming:

"Q. Did you volunteer any medical symptoms to the Doctor?

A. No, sir I did not.

Q. Did the Doctor touch you or examine you in any manner?

A. No sir, he did not."

All of the foregoing was obviously meant to convey to the jury and the court that some kind of a medical examination is necessary before prescribing sleeping pills for insomnia, and that if a doctor does not make such an examination, he is not acting in the course of his professional practice, and is guilty of a crime. What a monstrous claim!

Cole was further asked on cross-examination:

"Q. *Are you knowledgeable about the law as it pertains to narcotics?*

A. I *believe* so.

Q. Are there any guidelines that you are aware of that a doctor should follow before he prescribes Seconal?

A. In my *opinion*, yes.

Q. Not .in your opinion; do you know of any, written or otherwise? Is there a list of any requirements that a doctor must comply with before he issues a prescription for Seconal?

A. *I don't recall seeing any list of requirements that have to be fulfilled.*" (Emphasis supplied.)

This, from the Special Agent of the United States Department of Justice, Drug Enforcement Administration, who posed as an expert, being knowledgeable about the law as it pertains to narcotics, and who testified that, in his opinion, Dr. Carroll should have followed certain guidelines before he prescribed Seconal!

Cole was asked:

"Q. Do you know the difference between an objective symptom and a subjective symptom as it pertains to a person's illnesses?

A. I am not sure, no sir.

Q. Well, let me see if you can agree with me: an objective symptom would be something that can be observed by the doctor on his own examination, whereas a subjective symptom would be a symptom which you tell the doctor about; does that make any sense to you?

A. Yes sir.

Q. All right. Now, lack of ability to sleep would be a subjective symptom, would it not, or insomnia? It is something he can only find out from what you tell him, is that correct?

A. It could be, yes.

Q. Do you know of any test that he could give you which would show that you can't sleep?

A. I know absolutely nothing about insomnia.

Q. Except that you said you took these pills to help you sleep.

A. Yes sir.

Q. *Now, under the law as it was when you went into Dr. Carroll's office, he could have given you a prescription which could be automatically refilled, could he have not?*

A. *Yes, he could have.*

Q. *For any number of times?*

A. *Up to five times.*

Q. And he also could have given you a prescription for 15 pills so that you could come back each week, could he not?

A. Yes sir, he could have.

Q. And he could have charged you $10 each week—or $15 for that matter?

A. Yes sir, he could have.

Q. So that you are not saying, are you, that the Doctor did this to make money?

A. In my opinion, yes sir.

Q. Well, if he were doing it to make money why would he not have given you a prescription for only a week's supply and then told you to come back? He could make a lot more doing it that way, couldn't he, and you would not have complained?

A. Well, I did complain.

Q. What complaint did you make?

A. I complained because the prescription was only for 60.

Q. *And you wanted more?*

A. *I wanted 75.*

Q. *And so he gave them to you?*

A. *He gave me a prescription for 60, yes sir.*

Q. And he charged you $10?

A. Yes sir.

(Here is an instance of the Doctor refusing to prescribe an amount of pills the agent insisted upon.)

Q. And he told you that was a month's supply?

A. No sir, he did not.

Q. *Did he discuss with you how many you should take?*

A. *No sir.*

Q. *Did you look at the prescription?*

A. *No sir.*

Q. *Would you look at it right now? What does it say there?* * * *

A. *It says: 'Two capsules for sleep.'*

Q. *So he did tell you, at least by writing it on there, how many you were to take, didn't he?*

A. *Yes sir.*

Q. Would you take the bottle of pills that corresponds to that prescription? * * *

A. Yes.

Q. What does it say?

A. It says: 'Two capsules at bedtime for sleep.'

    *     *     *     *     *     *

Q. What did you expect him to give you by way of an examination?

A. I would normally expect a doctor to take my blood pressure and examine me further.

    *     *     *     *     *     *

Q. What is he supposed to look at when you tell him you can't sleep?

A. That I don't know.

    *     *     *     *     *     *

I made no complaint of sickness or suffering.

Q. You said you couldn't sleep?

A. I told him I took the pills for sleep." (He earlier testified his doctor in Cleveland had prescribed 75 Seconals a month for his sleeplessness.) (Emphasis supplied.)

This is the kind of testimony with which Dr. Carroll is confronted—an evasive witness, who is caught in lie after lie, and who, as an expert, thinks he should have been given a medical examination for a subjective malady that no doctor could discover by a medical examination, and in which no medical witness

was introduced who suggested a man should have a medical examination before being given a remedy to alleviate insomnia. Moreover, Cole complained to Dr. Carroll when he prescribed 50, instead of 75, Seconals for him. What can one make out of this farrago of contradictions, lies, and baseless complaints regarding the lack of a medical examination before obtaining sleeping pills, and another complaint because the doctor prescribed fewer sleeping pills than the number demanded. All of this testimony was worthless and the jury so found when it concluded that Dr. Carroll had been entrapped, and was not guilty of any illegal dealings with Cole.

Dr. Carroll was a kindly man. When Agent Fischner, for whom Dr. Carroll prescribed sleeping pills, introduced Agent McNamara as his brother-in-law and stated that he had used the pills prescribed for him, Dr. Carroll wrote out a prescription to take the place of the one McNamara had appropriated, and told him he should not take Fischner's pills, and that if McNamara was suffering from sleeplessness he would prescribe sleeping pills for him. McNamara then told Dr. Carroll about his sleeping trouble and being tense on his job. Dr. Carroll then wrote out a prescription for McNamara, and McNamara paid $10 each for the calls for three prescriptions—one for the prescription he was alleged to have taken from Agent Fischner, a new one for Fischner, and one for himself. Sometime later McNamara requested another prescription which Dr. Carroll prescribed for him, and for which he was not indicted.

All of the agents complained that they had not been given physical examinations by Dr. Carroll before securing the prescriptions. There is no requirement in law or medicine that a physical examination must precede the issuance of a prescription for sleeping pills. However, for these three prescriptions (and the additional one, on which Dr. Carroll was indicted), the jury found him not guilty and the government agents guilty of entrapment.

Later, McNamara told Dr. Carroll that he needed an additional prescription because he was going to Florida in a couple of weeks and would need them while there. He told Dr. Carroll that because of the need of his truck drivers for sleep, he had sold the prescriptions to them. He asked if he could secure prescriptions for his truck drivers because of their need for sleep. Dr. Carroll agreed and *wrote out one prescription for McNamara and five prescriptions for the truck drivers on October 18, 1973. McNamara testified that Dr. Carroll made out a complete patient record for each of the truck drivers and indicated on the official records the amount he had prescribed.* This appears a complete contradiction to the claim that Dr. Carroll was engaged in a secret unlawful drug transaction with McNamara. All of these six prescriptions were issued on October 18, 1973, and these were the prescriptions upon which Dr. Carroll was found guilty. As he said afterward, he was foolish to write six prescriptions on McNamara's solicitation on the same day, although five of the prescriptions were for truck drivers; but he had faith in McNamara, and took him for the fine man he seemed to be, but his trust was sadly misplaced. The folly obviously was that the placing of six prescriptions in the hands of one person at the same time would be suspicious, and the Doctor realized this shortly after accommodating McNamara.

When Dr. Carroll was asked why he had issued the prescriptions with different dates, he testified he did it because the agents asked him to write different dates on the prescriptions, and that "You will help us a heck of a lot doing it that way!" Dr. Carroll further testified that instead of writing the prescriptions with different dates, he could have accomplished the same purpose by marking on the prescriptions that they were to be refilled five different times and that, under the law at that time, he had the right to give such refillable prescriptions, so that the agents would not have had to come back each time for more prescrip-

tions. It was contrary to the law for a doctor not to date the prescriptions when he signed them. But, since he could, under the law, mark on the prescriptions that they were to be refilled five different times, the same object would have been accomplished as though he had dated them at different times and, because of this fact, the Government, in any event, would certainly not have indicted him under these circumstances, for what would have been a miniscule violation of the law. What bothered Dr. Carroll most, after McNamara had left the office, was the fact that, because of confidence in McNamara and his repeated importunities regarding the truck drivers, he had acceded thereto.

However, there are no guidelines that suggest a doctor commits a crime if he prescribes for a person whom he has not seen, especially when that person is vouched for by someone in whom the doctor has confidence. In any event, even in this connection, the government agents were actively persuading and soliciting Dr. Carroll, and trying to entrap him into an offense that they conceived and in which he had never had any previous disposition to accede and, in this, they did actually entrap him.

Dr. Carroll is presumed to be innocent of the crime with which he was charged. There is every indication that the prescriptions he issued were, in his opinion, for a legitimate medical purpose and that, in so prescribing, he was acting in the usual course of his professional practice—and the jury found him not guilty on the first four counts. It is easy to see how they concluded he was guilty when he issued six prescriptions at one time, on October 18, 1973, although they were all to different persons, but they were influenced, obviously, that McNamara, the head man, secured them all—was the inciting cause, and he had been found guilty of entrapment on the count that concerned him.

The chief claim is that Dr. Carroll was prescribing these drugs to make a lot of money. Everything in the case, including the testimony of the undercover agents, proves the contrary and shows that the manner, times and terms on which he prescribed, brought him the smallest amount that any doctor could receive for like legitimate purposes.

Dr. Carroll was found not guilty on the first four counts because of his lack of guilt or because of entrapment. Everything points to his good faith as to the last six counts, and it is obvious that he was the victim of the entrapment of the undercover agents. "When a person has no previous intent or purpose to violate the law, but is persuaded by law enforcement officers or their agents to commit a crime, he is a victim of entrapment, and the law, as a matter of policy forbids his conviction in such a case." This is the law, and the trial court charged the jury in the quoted language.

So the question is whether Dr. Carroll had a previous intent or purpose to violate the law before the undercover agents called on him, or whether he was *persuaded* by the government agents to prescribe as he did. There is absolutely no evidence that he had such a purpose and the evidence of everything in his entire life that appeared in the case, without dispute shows that he was a man of unblemished character, a doctor who had put six children through college and graduate schools, where they are making noble and notable achievements. There is not the slightest strand of suspicion that Dr. Carroll had a previous intent or purpose to break the law. *In every instance in which he prescribed, he filled out all the government forms for each person for whom he prescribed, and limited some to a certain number of pills, and others to such number as, in his judgment, was required.*

If there is any evidence of previous intent to violate the law, then the defendant is guilty, but there is not a strand of a hair's breadth of evidence that he had a previous intent to violate the law.

On every occasion on which he prescribed, the different undercover agents persuaded him to prescribe for their in-

somnia in order to relieve the distress of this baleful malady. Such persuasion cannot be confused with some assumed willingness and readiness to break the law when *a favorable opportunity is provided.* Everything was done by government officers to persuade Dr. Carroll to prescribe as he did. On all of the counts on which Dr. Carroll was convicted, there was the kind of *persuasion* used, under the guise of helping to remedy or alleviate a distressful malady, that would cause any humane doctor to do what he could to help the patient. All of the above shows that Dr. Carroll was not guilty on any counts, and was the victim of entrapment by government officers.

In these latter years thousands of doctors have been indicted for violating the drug laws by alleged illegal prescriptions and have been found not guilty and entrapped by government agents. The last two years of our history should make us sensitively aware of what wiretappers, eavesdroppers, and undercover government officials can do to place a citizen in jeopardy, but their illegal activities have generally been detected by courts, and the accused have been found to have been entrapped, and discharged as not guilty.

In the accompanying opinion it is stated that it is undenied that the agents in this case used deception in dealing with defendant. It is further stated that "deception is not forbidden * * * and does not, *without more*, establish entrapment as a matter of law." (Emphasis supplied.) With this statement I heartily agree, but there is something "more" in this case than deception by the officers. What that "more" is, is seen in the undisputed evidence.

*United States* v. *Russell, supra,* is cited in the accompanying opinion to sustain the claim that deception may be used in dealing with the defendant. But *Russell* further states: "It is only when the government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play."

It is remarkable that on the subject of entrapment in all the Supreme Court cases from *Sorrells* v. *United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932) to *United States* v. *Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), a period of forty-one years, the Court was divided 5 to 4, the majority holding that the focus must be on the predisposition and propensities of the defendant as an unwary innocent, or as an unwary criminal in the words of Chief Justice Warren heretofore quoted, and the minority holding that the focus must be on the action of the Government in inducing or instigating the crime as described in the applicable language of Mr. Justice Roberts:

"The applicable principle is that courts must be closed to the trial of a crime instigated by the government's own agents. No other issue, no comparison of equities as between the guilty official and the guilty defendant, has any place in the enforcement of this overruling principle of public policy." *Sorrells* v. *United States, supra,* at 459, 53 S.Ct. at 219.

From either of the two views in this case, the defendant must be found innocent because of the undisputed facts.

As Judge Cecil said in *United States* v. *Head,* 353 F.2d 566, 568 (1965) (C.A.6):

"Ordinarily, entrapment is a question of fact and in jury cases must be submitted to the jury. In the Sorrells' case, supra, the Court remanded the case to the District Court for retrial with instructions to submit the issue to the jury. *It may become a question of law when the facts are undisputed.* Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848; Morales v. United States, 260 F.2d 939, C.A.6; United States v. Burkhart, 347 F.2d 772, 775, C.A.6; Morei v. United States, 127 F.2d 827, C.A.6." (Emphasis supplied.)

What the undisputed evidence shows is that defendant was an industrious, innocent, law-abiding man with no previous

disposition or intention to commit the offense; that the criminal design of committing the offense originated with the government officers; that the officers implanted in the mind of defendant the disposition to commit the alleged offense for the purpose of prosecuting him for the commission of a crime and, by repeated, persistent and incessant solicitation, so induced him and succeeded in accomplishing their purpose. The foregoing is held in *Sorrells* v. *United States, supra,* to be entrapment. One can hardly escape the view, as the evidence discloses, that Dr. Carroll was an innocent man; that whatever offense he may have committed was conceived by the government agents with the object of prosecuting him, and was implanted in his mind by them; that he acceded to their repeated, persistent and incessant solicitations with no evil intent or import; that what he is accused of doing, if an offense, was not conceived by him as criminal at the time it occurred; and that Dr. Carroll, with an unblemished reputation and character during the whole of his professional life of serving the community in which he lived, should, at the age of 70 years, be crowned with praise rather than be fined $15,000 and placed on probation for two years—an action that, if sustained, would, in my opinion, be a miscarriage of justice; would ruin his professional life, his reputation, his honor, and all that he holds dear in the world.

In view of the undisputed evidence of entrapment, the trial court was bound to hold as a matter of law that defendant was entrapped; and, accordingly, the judgment heretofore entered should be reversed, the sentence set aside, and a judgment should be entered dismissing the case.